ON REMAND FROM THE UNITED STATES SUPREME COURT
 

 VICTORY, J.
 
 *
 

 11 Jesse Jay Montejo was convicted of the first degree murder of Lewis Ferrari and sentenced to death by a St. Tammany Parish jury on March 10, 2005. This Court affirmed Montejo’s conviction and death sentence.
 
 State v. Montejo,
 
 06-1807 (La.1/16/08), 974 So.2d 1238,
 
 reh’g denied,
 
 06-1807 (La.3/07/08). The main issue before us on appeal was the admissibility of videotaped statements taken during a police interrogation of Montejo on the day he was taken into custody, September 6, 2002, continuing into the next day, in which Montejo slowly made increasingly incriminating statements until he finally admitted that he shot the victim who had unexpectedly returned home and interrupted Mon-tejo’s burglary.
 
 [1]
 
 These videotapes were the centerpiece of the State’s case. We held that the videotaped statements were admissible, even though Montejo had requested an attorney during the interrogation, because the interview was properly terminated when he requested counsel, his rights were scrupulously honored before he retracted his request for counsel, and he validly | ¿waived his rights before the resumption of the interrogation.
 
 Id.
 
 at 1256-1258. In addition, we ruled that a letter of apology
 
 [2]
 
 written by Montejo to
 
 *955
 
 the victim’s wife while he rode with the police to lead them to the murder weapon, after he had been appointed counsel at a 72-hour hearing,
 
 [3]
 
 was admissible under the Sixth Amendment. While
 
 Michigan v. Jackson,
 
 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), forbade police to initiate interrogation of a criminal defendant once he had requested counsel at an arraignment or similar proceeding, we held that because Montejo stood mute at the 72-hour hearing when counsel was appointed, he did not assert his right |3to counsel and thus the police were not prevented by
 
 Jackson
 
 from interrogating him once he had been read his rights pursuant to
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 
 Id.
 
 at 1260-61.
 

 The United States Supreme Court granted Montejo’s writ application to consider whether the letter was admitted in violation Jackson,
 
 [4]
 

 Montejo v. Louisiana,
 
 — U.S. —, 129 S.Ct. 30, 171 L.Ed.2d 931 (2008), and, after oral argument, solicited further briefing on whether
 
 Jackson
 
 should be overruled. In a 5-4 opinion, the Court overruled
 
 Jackson
 
 and held that a defendant’s rights are adequately protected by the rules announced in
 
 Miranda
 
 and
 
 Edwards v. Arizona,
 
 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (under which a defendant in custody cannot be interrogated once he has asserted his right to counsel unless he initiates further communications with police).
 
 Montejo v. Louisiana, —
 
 U.S. —, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009).
 
 [5]
 
 After overruling
 
 Jackson,
 
 the Supreme Court remanded the case to this Court, stating:
 

 Although our holding means that the Louisiana Supreme Court correctly rejected Montejo’s claim under
 
 Jackson,
 
 we think that Montejo should be given an opportunity to contend that his letter of Lapology should still have been sup
 
 *956
 
 pressed under the rule
 
 of Edwards. If
 
 Montejo made a clear assertion of the right to counsel when the officers approached him about accompanying them on the excursion for the murder weapon, then no interrogation should have taken place unless Montejo initiated it.
 
 Davis, supra,
 
 at [512 U.S. 452,] 459, 129 S.Ct. 2079[, 173 L.Ed.2d 955 (1994)]. Even if Montejo subsequently agreed to waive his lights, that waiver would have been invalid had it followed an “unequivocal election of the right.”
 
 Cobb,
 
 532 U.S. at 176,121 S.Ct. 1335 (Kennedy, J., concurring).
 

 Montejo understandably did not pursue an
 
 Edwards
 
 objection, because
 
 Jackson
 
 served as the Sixth Amendment analogy to
 
 Edwards
 
 and offered broader protections. Our decision today, overruling
 
 Jackson,
 
 changes the legal landscape and does so in part based on the protections already provided by
 
 Edwards.
 
 Thus we think that a remand is appropriate so that Montejo can pursue this alternative avenue for relief. Mon-tejo may also seek on remand to press any claim he might have that his Sixth Amendment waiver was not knowing and voluntary,
 
 e.g.,
 
 his argument that the waiver was invalid because it was based on misrepresentations by police as to whether he had been appointed a lawyer,
 
 cf. Moran [v. Burbine],
 
 475 U.S. [412] at 428, 429[, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) ]. These matters have heightened importance in light of our opinion today.
 

 We do not venture to resolve these issues ourselves, not only because we are a court of final review, “not of first view,”
 
 Cutter v. Wilkinson,
 
 544 U.S. 709, 718, n. 7[, 125 S.Ct. 2113, 161 L.Ed.2d 1020] (2005), but also because the relevant facts remain unclear. Montejo and the police gave inconsistent testimony about exactly what took place on the afternoon of September 10, 2002, and the Louisiana Supreme Court did not make an explicit credibility determination. Moreover, Montejo’s testimony came not at the suppression hearing, but rather only at trial, and we are,unsure whether under state law that testimony came too late to affect the propriety of the admission of the evidence. These matters are best left for resolution on remand.
 

 Montejo,
 
 129 S.Ct. at 2091-92. Defendant’s rehearing application was denied on July 27, 2009.
 
 Montejo v. Louisiana,
 
 — U.S. —, 130 S.Ct. 23, 174 L.Ed.2d 606 (2009).
 

 In accordance with the Supreme Court’s ruling, on September 4, 2009, this Court issued a briefing notice, ordering the parties to address the following “regarding the admissibility of the letter of apology written to the victim’s wife, Pat Ferrari, on September 10, 2002:”
 

 (1) whether defendant, Jesse Jay Mon-tejo, made a clear assertion of the right to counsel for purposes of the rule of
 
 Edwards v. Arizona,
 
 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), when the officers
 

 1 ¿approached him about accompanying them on the excursion for the murder weapon;
 

 (2) if Montejo did make a clear assertion of his right to counsel at that time, whether Montejo initiated further communication, exchanges, or conversations with the officers prior to writing the letter;
 

 (3) if Montejo waived his Sixth Amendment right to counsel, whether this waiver was knowing and voluntary;
 

 (4) if the trial court erred in admitting the letter, whether the admission of the letter constituted harmless error.
 

 
 *957
 

 State v. Montejo,
 
 06-1807 (La.9/04/09) (unpublished).
 

 After considering the record and the arguments of counsel on remand, we find that Montejo’s arguments on remand are precluded under state law because he did not raise them at the trial court in a motion to suppress. Although a reviewing court may consider trial testimony in determining whether a motion to suppress should have been granted, that jurisprudential rule only applies where a defendant has raised the grounds to which that testimony relates in a motion to suppress. Montejo did not argue that the letter should have been suppressed because he made a clear assertion of his right to counsel on September 10, 2002, such that the protections of
 
 Edwards
 
 would apply, or that his subsequent waiver was invalid because it was based on misrepresentations by police as to whether he had been appointed a lawyer, as grounds for suppressing the evidence in the district court; therefore, his testimony at trial came too late to affect the admissibility of the letter under state law. In addition, any error in admitting the letter was harmless. Accordingly, we reaffirm Montejo’s conviction and death sentence.
 

 | (¡REVIEW OF THE RECORD ON REMAND
 
 [6]
 

 On September 28, 2003, Montejo filed a brief boilerplate motion to suppress all inculpatory statements.
 
 [7]
 
 At hearings on the motion to suppress, Detective Wade Major testified that he and Detective Bobby Juge took Montejo out of jail on September 7, 2002, and transported him to the Hwy. 11 bridge to show them where he claimed to have thrown the murder weapon. Montejo accompanied them voluntarily to help them find the gun so that he could prove that he used the victim’s own revolver, which he found in the course and scope of the burglary, rather than a weapon that he brought with him. At the same hearing, Detective Jerry Hall described three follow-up visits that he conducted with Montejo at the jail on September 10 after divers were unable to find the murder weapon. Detective Hall testified that on none of these visits did Montejo request a lawyer, mention that he was represented or had attended a 72-hour hearing that morning, or indicate that he did not wish to speak with detectives. In fact, on one of these follow-up visits, Detective Hall “inquir[ed], have you been contacted by counsel?” to which Montejo responded “no, I don’t need one.... I just want to clear all this up.” The first two visits, at 8:45 a.m. and noon, were very brief. At some point during the third, 2:45 visit, Montejo agreed to accompany Detectives Hall and Dale Galloway on the next 17expedition, which may have commenced around 5:00 p.m. During that excursion, Montejo indicated that he had discarded the money bag in a garbage dumpster at a shell station in Gretna. The detectives transported Mon-
 
 *958
 
 tejo to that Shell station and were preparing a warrant to search the dumpster when they discovered it had been emptied the previous .day. Detective Hall also testified Montejo executed a handwritten statement during this expedition at 7:15 p.m. to memorialize his voluntary cooperation in these activities.
 
 [8]
 
 After Detective Hall completed his testimony on April 20, 2004, defense counsel informed the court that he would likely wish to call the defendant, to testify at a subsequent hearing in support of his motion to suppress, but he would like to defer that decision until after the videotaped statement taken on September 6-7 [in which Montejo eventually confessed to the crime] was reviewed.
 

 At a subsequent suppression hearing on June 1, 2004, Detective Hall testified that he did not know on September 10, 2002, that an attorney had been appointed that morning to represent Montejo. He did not learn this until the early evening, when he received a call telling him that an attorney was looking for him. Detective Hall was in the sally port
 
 [9]
 
 bringing Montejo back to the jail when he received this call. According to Detective Hall, Montejo did not reveal that he had been to court that morning and never indicated that counsel had been appointed. Detective Hall testified that he had asked Montejo on September 10 whether he had been contacted by an attorney or whether his family had secured an attorney for him, and Montejo responded “no, I haven’t heard from anybody, nobody at all.” Immediately after this testimony, Montejo’s counsel declined the opportunity to re-examine Detective Hall | Rand presented no witnesses to rebut this testimony. No other evidence was presented on the motion to suppress.
 

 At the close of the suppression hearings, defendant’s arguments were directed solely at the statements obtained during the September 6-7 interviews, specifically that Montejo’s clear invocation of his Fifth Amendment right to counsel during the September 6-7 interrogation was captured on video, that his request was not scrupulously honored, that detectives reinitiated questioning, and that the subsequent waiver was invalid. He made no arguments regarding the September 10 events or the letter. In response to further prompting from the district court to “state ... the issue before the Court,” defense counsel again focused solely on the September 6-7 mid-interrogation invocation without any reference to the events that occurred on September 10 or any Sixth Amendment claim. Therefore, the district court had to inquire whether there were not in fact two questions before the court: “namely, should the statement of the defendant that was videotaped in Slidell, should that be suppressed, and secondly, should any statement or information obtained by Detective Jerry Hall on September 10th be suppressed.... Isn’t that what is before the Court, gentlemen?” Defense counsel simply agreed. In the ruling that followed, the district court ruled that the September 6-7 videotaped statements were admissible, and that the September 10 letter was also admissible, reasoning “the fact that an attorney is appointed in a 72-hour hearing does not tacitly convey to all of the force [that] a defendant has an attorney or if he does have an attorney it certainly doesn’t prevent that defendant from exercising his own constitutional rights and giving up those rights.” The district court denied the motion to sup
 
 *959
 
 press. On the morning before trial, out of the presence of the jury, defense counsel remarked that his client’s decision to testify was based, in part, on the denial of his motion to suppress, stating:
 

 | nFirst and foremost, I want to reiterate what I believe I have said on the record earlier in the week, that my decision regarding Mr. Montejo taking the witness stand and disclosing his prior criminal record to the jury was based upon the Court’s rulings earlier in the week, and also upon the Court’s ruling’s early, earlier regarding the motion suppress. Had the motions been granted, I likely wouldn’t — I certainly would not have put him on the witness stand.
 

 Trial commenced, and the following references to the letter and the events of September 10 were made. The State mentioned Montejo’s apology letter once during opening remarks. Between a lengthy description of the September 6-7 interrogation (in which the State emphasized Montejo’s delaying tactics, savvy alterations to his story, and bluffing) and a brief mention of the DNA evidence (as the last piece of the puzzle),
 
 [10]
 
 the State made the following comment:
 

 Detective Jerry Hall — remember the Sheriffs Office? He’s got the dive team out there trying to find the gun. The defendant has given them different versions of where this gun is. He signs out Montejo, gives him a rights form, three days of searching, no gun. He is directed by Montejo to a dumpster which is supposed to have the bank bag. And most importantly, on the way back in, I’m so sorry.
 

 The defendant executes, and asks, can I have a pen and some paper, I want to write a letter, I want to write a letter to this lady and tell her I’m sorry, I am so sorry. And the defendant proceeds in his own handwriting to write a heartfelt letter describing how it was all an accident, it shouldn’t have happened this way and he feels sorry.
 

 The State then referred to the events of September 10 twice during the presentation of its case. A brief mention is made during the testimony of Deputy John Morris after he described the failure of divers to find the murder weapon:
 

 Q. Subsequent to that, were you aware of officers interviewing Mr. Montejo on September 10th, 2002?
 

 A. Yes.
 

 Q. What was the purpose of that follow-up interview?
 

 A. They were bringing him out to, I believe, to a gas station over in the West Bank at that particular time. |inOn cross, Deputy Morris clarified that he, as lead investigator, sent the detectives to take Montejo out of jail on September 10 and he denied that he was aware that counsel was appointed that morning.
 

 The events of September 10 are not mentioned again during the State’s case until their final witness, Detective Hall, testified. He testified that he conducted follow-up interviews with Montejo on September 10 because divers could not find the murder weapon in the location Montejo provided. He identified the signed waivers that Montejo had executed at the beginning of each visit. He described these visits as follows. First, Detective Hall visited Montejo in the morning, briefly inquired into his well-being, and did not “press him at all on the investigation.” Later in the afternoon, after the execution of the 2:45 p.m. waiver, Montejo accompa
 
 *960
 
 nied him and Detective Galloway to the Hwy. 11 bridge. Detective Hall testified that while on the bridge, Montejo claimed he had disposed of evidence, that he previously claimed he burned, at a gas station in Gretna and he agreed to show the detectives the location. The detectives provided Montejo with paper and pen so that he could write a brief statement explaining that he was voluntarily accompanying the officers to search for evidence at the gas station. No evidence was recovered at the dumpster as it had recently been emptied. However, Detective Hall testified that on the ride back to jail, Montejo requested pen and paper again because he said “he wanted to wanted to write something.” Montejo then, at about 8:30 p.m., wrote the letter addressed to the victim’s widow. Detective Hall identified this letter but did not describe its contents. When they arrived back at the jail, he was directed to meet with an upset public defender. Throughout his testimony, on direct and cross-examination, Detective Hall maintained that all waivers, statements, and handwritten notes were produced by Mon-tejo voluntarily and without coercion, and that Montejo never requested the assistance of an attorney. On cross-examination, in suggesting that | „ detectives dictated the letter Montejo wrote, which the defense described as either a “confession” or an “apology,” defense counsel directed the jury’s attention to its contents:
 

 Q. Direct your attention to State’s Exhibit Number 76, at the very bottom. “I am so sorry, please forgive me.” Would you read the next sentence that he writes, to the ladies and gentlemen of the jury, after you have read it to yourself?
 

 A. May I—
 

 Q. Where it says, four lines from the bottom, “I am so sorry, please forgive me.”
 

 A. Okay.
 

 Q. Would you read the next sentence to the ladies and gentlemen of the jury?
 

 A. “I was going for a simple burglary, in and out, that someone put me on, and instead I found the gun so I — ”
 

 Q. What is the simple burglary?
 

 A. Under the laws, simple burglary is when you break into an inhabited motor vehicle or dwelling or structure belonging to another.
 

 Q. It’s a legal term, isn’t it?
 

 A. Yes.
 

 Q. Simple burglary as opposed to aggravated burglary or unauthorized entry, it’s a legal term contained in the law books?
 

 A. Yes.
 

 Q. You are telling me that this man over here — and it’s a Louisiana term— there’s no simple burglary in Texas or Florida or Alabama, it’s a term indigenous to Louisiana. You’re telling me this man over here when he is writing that letter, without any prompting from any police officer, writes in the letter I was going for a simple burglary. Is that your testimony, sir?
 

 A. He wrote it, sir.
 

 On redirect, the State referred Detective Hall to more of the letter’s contents:
 

 Q. —let me show you that paper, the apology letter. We will call it an “apology letter” for purposes of this discussion. Did you also tell him, |]2I promise you I didn’t cold-blooded kill him, Mr. Lou, did you tell him to write that in his statement?
 

 A. I didn’t tell the man to write anything, sir.
 

 Q. Did you tell him to write in his statement, forgive me, Mrs. Ferrari?
 

 A. No, sir.
 

 
 *961
 
 Q. Did you tell him to say, I need your forgiveness, Mrs. Ferrari, I am more sorry for what happened, please forgive me? Did you say put that in your letter, Mr. Montejo, make sure you write that in your letter?
 

 A. No, counselor, I did not.
 

 At the close of the State’s case, the State’s exhibits, which presumably included the apology letter, were published to the jury.
 

 The defense called three witnesses, Deputy Morris,
 
 [11]
 
 Montejo, and Mary Melan-con. Montejo testified about the events of September 10 as follows:
 

 Q. All right. Now, on September the 10th, in the morning, do you remember being brought into the video room?
 

 [[Image here]]
 

 A. Yes, sir.
 

 Q. Do you remember having a seventy-two hour hearing?
 

 A. Yes.
 

 Q. You know what a seventy-two hour hearing is?
 

 A. Now, I do, to — I know what it means now. At that time they advised me of what I was charged with, and told me I had appointed counsel.
 

 Q. And that was before Hall and Major came and got you later that day, isn’t it?
 

 A. Yes, sir.
 

 Q. Now, the judge advised you, was he there in person or on the television?
 

 A. He was there in person, sir.
 

 11SQ. All right. And the, the IDP was appointed?
 

 A. (No response)
 

 Q. Did you know what that meant?
 

 A. No, sir.
 

 Q. Did you know that was a lawyer that was appointed for you?
 

 A. He said, he said he was appointing counsel in whichever words he said it in and basically got the message to me that somebody was appointed to me.
 

 Q. Now, when Major and Hall came to get you that afternoon, what did they tell you?
 

 A. They asked me if I would come with them to go clear up where I threw the gun at. So I said, Well, and I don’t, I don’t, I don’t really want to go with you. He said, Do you have a lawyer? I said, yeah, I got a lawyer appointed to me. He said, No, no you don’t. I said, Yeah, I think I got a lawyer appointed to me, and I guess that’s where I messed up, when I said I think I got a lawyer appointed to me. He said, No, you don’t. He said, I checked, you don’t have a lawyer appointed to you.
 

 Q. Who said that?
 

 A. That was the one that was sitting here, Hall.
 

 Q. All right. What did you say when he said that?
 

 A. I was like, Well, I thought I had one appointed to me. He is like, No. He is like, I need you to come with me, will you come with me. At which time I was like, okay. Back then in them days, in the two-and-a-half years ago, I had a very gullible character, I was very easily led. I mean, it is obvious. Everybody seen it for their self. Everything that these police have said or did I followed right then. I was—
 

 Q. All right.
 

 A. —very easily taught. You could tell me anything.
 

 Montejo testified that he then went with detectives to the bridge and pointed out a different spot for them to search to placate Detective Hall. He tried to further placate
 
 *962
 
 them by taking them to the Shell station on the West Bank:
 

 Q. Now, did you point out a Shell gas station?
 

 A. Yes, I did. And the reason why I did that is because he told me, he [ Hsaid, look, we searched 1-10, we searched the interstate, you know, there is not one sign of the bag being burnt nowheres as that dumpster, and there’s nothing on I-10. And I told him, well, causes I really didn’t have it, and that then again, he then got mad again. He said, where is it? And
 

 I told him, all right, it was at a Shell station.
 

 Finally, he described how detectives prompted him to write a letter of apology to the victim’s widow:
 

 Q. Did they tell you what to write?
 

 A. Sir, it was Detective Hall’s suggestion to write apology letter, and during his suggestion, he told me, you know, just let them know, why you are apologizing that it wasn’t intended to be an aggravated burglary, that it was supposed to just be a simple burglary, and he popped up on it.
 

 Q. Do you know what a simple burglary is?
 

 A. At that time I did not. An when he said it, it sounded like just plain, you know, like—
 

 Q. Like an easy burglary?
 

 A. A simple burglary, yeah. That’s that’s what it sounded like to me when he said that. I didn’t realize until after I’ve been here so long that a simple burglary is actually a statute.
 

 Q. So that’s his suggested words to you?
 

 A. Yes, sir, say that it was a simple burglary. And at — when I wrote the letter, Hall didn’t stand next to me, though. It was Galloway, Detective Galloway sat next to me, and at that time, when I am making this apology letter, I really do in my heart, I feel sorry for the family, and I apologize to the whole family for what happened. I swear to God I felt sorry for that. They — I can’t, I was really, really apologizing to the family in that letter, because I was really sorry for what happened, period. I know I didn’t do it, but I am still very sorry for what happened.
 

 And I was writing that apology letter and Galloway was sitting next to me, and I would write a couple of lines, he would say just that you didn’t have no intentions, and I would put that, but then I would keep going on apologizing, and that’s when he said, remember what Hall said, just write that it was a simple, a simple burglary, meant to be a simple burglary, I came upon on it, that’s when I wrote that.
 

 And then he began, on the next page, Galloway was telling me, well, just tell her a little bit about what happened, let her know that you was in there and you found the gun and he came home on you, and you tried to knock him out but — with the gun, but, you know, he kept | ^fighting, and, you know, and so I wrote that as — I was basically writing everything he was telling me, along with some of my own personal apologies.
 

 The third witness, Mary Melancon, a family friend, testified that she visited Montejo in jail and that he told her the same story then that he testified to at trial.
 
 [12]
 
 The State briefly referred to the
 
 *963
 
 apology letter during her cross-examination:
 

 Q. Do you recognize Jesse’s handwriting?
 

 A. No, I couldn’t tell you I would recognize it. I mean, I have gotten a couple, maybe two, two letters from Jesse. I couldn’t tell you I would know it. I mean, if I saw it, I probably could tell you. It was kind of like a large print, very nice handwriting.
 

 Q. State 76 and 75, does that appear to be his handwriting?
 

 A. If I had my letter to compare it to, I could tell you, but I don’t have the letter to compare it to. If I had know, I would have looked at the letter he has written me, because I do have it.
 

 Q. So you have never read these two letters that he wrote to the police and Ms. Ferrari?
 

 A. No, I didn’t even know that these existed. If he told me, I don’t remember.
 

 Finally, the State indirectly raised the specter of the apology letter in its closing remarks. The state depicted Montejo as a liar who was ironically truthful when he testified that his “I am so sorry version” .of the crime was a lie because, according to the State, Montejo waited for the victim to arrive home to rob him and then killed him rather than leave a witness behind. The defense in closing accused the detectives of deception and then addressed the apology letter directly:
 

 It is amazing to me that this investigation had so many typos. Detective Hall, I have got | lfithe wrong day. Detective Morris, I have got the wrong time, which brings us to the State’s Exhibit Number 76, the so-called apology letter. This to me, as someone who pretty much my entire legal career has been in the criminal justice system, this jumped out at me more than anything else that I saw. In this letter, at the very bottom, where he begs forgiveness — and he tells you the police told him what to say — “I was going for a simple burglary.”
 

 I introduced Defendant’s Exhibit Number 6, which is page 42 of the Louisiana Code of Criminal Procedure, has all the laws regarding procedure, the statutory laws. Title 14:62 is simple burglary. Now, folks, the judge told you none of these things you can take back. These written items, you can’t take the tape back. So I am going to kind of remind you of this again. You all looked at it yesterday.
 

 You know, if somebody didn’t know too much about law enforcement. You know, certain crimes in Louisiana have the preface “simple”. There’s simple burglary, there is simple arson, there is simple robbery, you know. Those are pretty bad crimes, you know. Why the term “simple”? There’s nothing simple about a burglary. But that’s the way the legislature drafted it. It is not simple, like it’s easy. It is simple because that’s what the statue[statute] says. Do you think he reviewed the Louisiana Code of Criminal Procedure before he wrote that letter? Where did simple burglary come from?
 

 You know what? There is probably not one single person here, including the cops that took this statement, that knew what happened, that don’t believe that
 
 *964
 
 that information was supplied to him. How else can you explain it? He writes simple burglary, somebody told him simple burglaiy. Somebody told him a lot of different things. There is no other way to explain that, ladies and gentlemen.
 

 If you take that one fact, and I don’t expect that Mr. Gracianette is going to get up here and challenge this at all, like he did when he tried to say — to have Hall say, well, you mean, simple, like it was easy. Nobody, other than a child, is going to think, but that this is not what happened.
 

 So, folks, I will leave you with this: If you believe that simple burglary was provided to him by the police, then take that point in time and go backwards with it and think what else did they say and what else did they do in this case. Was that proper? It was absolutely improper. And proof of that is that they denied doing it, but they did it. There’s simply, no — folks, when you go back, you know, at some point talk about what I am suggesting to you. And if they did that, is it so hard to believe that he told them he wanted a lawyer, they said you get a lawyer later, that they intimidated him, they suggested what to say.
 

 |17The State then rebutted the defense’s argument as follows:
 

 [T]he last point that Mr. Williams made to you was that the finest of St. Tammany Parish police officers lied, deceived you, because they coerced an apology letter from the defendant.
 

 Now, you know that is not to be true, but what he claims is the basis for that conclusion is the reference in this letter to the term “simple burglary” and that admission by Mr. Montejo. You believe that? Because if you think the police officers are trying to extract a confession out of him to fit their case, you think they would do a better job of it. Because, you know, under the law, State of Louisiana, for the crime of first degree murder to be committed, it doesn’t take place during the commission of a simple burglary. It requires the commission of an aggravated burglary. That’s the law.
 

 And if the police officers really wanted to build their case and they really wanted to make this confession a good one, they would have included not a simple burglary, which doesn’t fit the crime of first degree murder, they would have said, Jesse, put in aggravated burglary and armed robbery.
 

 The apology letter and the events of September 10 were never mentioned during in the jury instructions nor during the penalty phase. The admission of the apology letter was, however, one basis asserted in Montejo’s motion for new trial:
 

 Defendant additionally claims as error the introduction of a handwritten statement taken from him by investigators on September 10, 2002. Prior to being questioned on this date, defendant had appeared in court for a 72 hour hearing and counsel was appointed to represent him.
 

 In
 
 Brewer v. Williams,
 
 430 U.S. 387[, 97 S.Ct. 1232, 51 L.Ed.2d 424] (1977), the U.S. Supreme Court held that the right to counsel attaches when “judicial proceedings have been initiated” against the defendant and that once adversary proceedings have commenced, the defendant “has a right to legal representation when the government interrogates him.” The
 
 Williams
 
 court rejected the State’s argument that the defendant’s confession was legal because he had failed to explicitly assert this right to his interrogators. In light of
 
 Williams
 
 and progeny, it was illegal for interrogators to remove defendant from jail and interro
 
 *965
 
 gate him without counsel present, regardless of whether defendant asked for a lawyer. It was therefore error for this Court to admit such evidence, and this error should entitle defendant to a new trial.
 

 As noted above, the defendant did not present any evidence, or argument, at the motion to suppress that he asserted his right to counsel for
 
 Edwards
 
 purposes on September 10, that the police lied to him about not having a lawyer, or that the police | ,8kept him from seeing his lawyer.
 
 [13]
 
 However, Montejo contends that the only concern that was pertinent to the apology letter when he sought to suppress it pretrial was whether .he was entitled to the protection of
 
 Jackson.
 
 Now that the Supreme Court has eliminated this protection, he argues that this Court should remand to the distinct court for hearings in which he can inquire further into the following questions: (1) whether he requested counsel at his 72-hour hearing; (2) whether he invoked his right to counsel when he was approached at the jail on September 10; (3) whether he was properly
 
 Mirandized
 
 by detectives before he left the jail with them on September 10; (4) whether detectives knew that he had been appointed counsel at his 72-hour hearing; and (5) whether police removed him from the jail on September 10 to keep him away from appointed counsel. Montejo contends that the record is inadequate to answer these questions because he relied on the protection of
 
 Jackson
 
 and he suggests that this Court lacks jurisdiction under La. Const. Art. V, § 5(C) to make the factual determinations that are now necessary under the Supreme Court’s ruling. Montejo emphasizes that the Supreme Court declined to resolve these issues, in part, “because the relevant facts remain unclear.”
 
 Montejo, supra,
 
 129 S.Ct. at 2092.
 
 [14]
 
 The State, however, points out that the Supreme Court also recognized that “Monte-jo’s |19testimony came not at the suppression hearing, but rather only at trial, and we are unsure whether under state law that testimony came too late to affect the propriety of the admission of the evidence.”
 
 Id.
 
 Thus, the State argues under state law, because Montejo has never claimed until now that he asserted his right to counsel on September 10 or the police misled him as basis for suppressing the apology letter, he is barred from pursuing those claims now. The State dis
 
 *966
 
 putes Montejo’s assertion that the only pertinent claim before the Supreme Court’s ruling arose from
 
 Jackson
 
 and argues that, under the jurisprudence at the time of the suppression hearing, any clear invocation of his right to counsel or involuntary or unknowing waiver would have provided an independent basis to suppress the apology letter, which claims defense counsel would have pursued if facts existed to support them. In addition, the State claims that any error in admitting the letter was harmless.
 

 DISCUSSION
 

 State Law Requirements for a Motion to Suppress
 

 The provisions of La.C.Cr.P. art. 703 govern the procedures for a motion to suppress. That article provides that a “defendant adversely affected may move to suppress any evidence for use at the trial on the merits on the ground that it was unconstitutionally obtained” and “may move on any constitutional ground to suppress a confession or statement of any nature made by the defendant.” La. C.Cr.P. art. 703(A) and (B). The motion must be filed in accordance with La. C.Cr.P. art. 521, which provides it must be filed within 15 days of arraignment or whatever date is set by the court for the filing of such motions, “unless opportunity therefor did not exist or neither the defendant nor his counsel was aware of the existence of the evidence
 
 or the ground of the motion,
 
 or unless the failure to file the motion was otherwise excusable.” La. C.Cr.P. art. 703(C)(emphasis added). “The court in its discretion Lnmay permit the filing of a motion to suppress at any time before or during the trial.” La. C.Cr.P. art. 703(C). At the trial of the motion, “the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant....” La.C.Cr.P. art. 703(D); La. R.S. 15:451 (before the state may introduce a confession into evidence, it has the burden of proving that the statement was free and voluntary and not induced by threats, promises or coercion). If a statement is a product of custodial interrogation, the state additionally must show that the person was advised before questioning of his right to remain silent, that any statement he makes may be used against him, and, that he has a right to counsel either retained or appointed.
 
 State v. Blank,
 
 04-0204 (La.4/11/07), 955 So.2d 90, 103. Where the defendant alleges police misconduct in reference to the statement, the state must specifically rebut these allegations.
 
 State v. Vessell,
 
 450 So.2d 938, 942-43 (La.1984). A hearing on the motion shall only be held “when the defendant alleges facts that would require the granting of relief.” La.C.Cr.P. art. 703(E)(1).
 

 The defendant may testify at the motion to suppress without being subject to interrogation into other matters and his testimony cannot be used by the state at trial except to attack the credibility of his testimony at trial on the merits. La.C.Cr.P. art. 703(E)(1). If the defendant testifies at trial, he can be cross-examined on the whole case. La.C.Cr.P. art. 703(E)(2).
 

 The rules further provide that “[a] ruling prior to trial on the merits, upon a motion to suppress, is binding at the trial” and “failure to file a motion to suppress evidence in accordance with this Article prevents the defendant from objecting to its admissibility at the trial on the merits
 
 on a ground assertable by a motion to suppress.”
 
 La.C.Cr.P. art. 703(F) (emphasis added). Finally, subsection (G) provides:
 

 
 *967
 
 12iWhen a ruling on a motion to suppress a confession or statement is adverse to the defendant, the state shall be required, prior to presenting the confession or statement to the jury, to introduce evidence concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement.
 

 A ruling made adversely to the defendant prior to trial upon a motion to suppress a confession or statement does not prevent the defendant from introducing evidence during the trial concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement.
 

 La.C.Cr.P. art. 703(G).
 
 [15]
 
 The trial court is afforded great discretion in ruling on a motion to suppress, and its ruling will not be disturbed absent an abuse of that discretion.
 
 State v. Lee,
 
 05-2098 (La.1/16/08), 976 So.2d 109,122.
 

 Read in conjunction, and with reference to each other, these provisions allow a defendant to object to the admission of a confession by the filing of a motion to suppress on any constitutional grounds. He must file this motion within the time limitations set by the trial judge, which may even be during the trial on the merits, and must assert the constitutional grounds under which the confession must be suppressed and the facts entitling him to relief thereunder. The only exception to this rule is if the defendant or his counsel was unaware of the evidence or the ground of the motion, or the failure was otherwise excusable. A ruling on the motion is binding at trial and the defendant may not object to its admissibility at trial on a ground that was assertable by a motion to suppress. He may, however, present testimony at trial | ¡^surrounding the making of the confession for the purpose of enabling the jury to determine the weight to be given the statement.
 

 Louisiana courts have long held a defendant may not raise new grounds for suppressing evidence on appeal that he did not raise at the trial court in a motion to suppress.
 
 State v. Brown,
 
 434 So.2d 399 (La.1983) (rejecting defendant’s alternative argument regarding the denial of his motion to suppress because he had not raised the issue at trial);
 
 State v. Johnson,
 
 07-1040 (La.App. 4 Cir. 9/10/08), 993 So.2d 326 (“failure to raise a ground for suppressing an item of evidence in a properly filed motion to suppress waives such a basis for exclusion on appeal”);
 
 State v. Jackson,
 
 04-1388 (La.App. 5 Cir. 5/31/05), 904 So.2d 907,
 
 writ denied,
 
 05-1740 (La.2/10/06), 924 So.2d 162 (defendant is limited on appeal to the grounds he articulated at trial and a new basis for a claim, even if it would be meritorious, cannot be raised for the first time on appeal);
 
 [16]
 

 see
 
 
 *968
 
 La.C.Cr.P. art. 841 (providing that a new basis for an objection cannot be raised for the first time on appeal).
 

 We have previously considered the problems arising when a party does not file a motion to suppress, and then later testifies at trial as to facts that suggest the evidence should have been suppressed.
 
 State v. Lipscomb,
 
 00-2836 (La.1/25/02), 807 So.2d 218 and
 
 State v. Watson,
 
 00-1580 (La.5/14/02), 817 So.2d 81. In
 
 Lipscomb,
 
 the defendant alleged on appeal that his attorney at trial provided ineffective assistance of counsel by failing to file a motion to suppress evidence. This Court found ineffective assistance claims are to be considered in post-conviction ^proceedings and not on appeal, and, in so holding, explained the reasons why motions to suppress are required pre-trial:
 

 [T]he constitutional validity of a seizure is ordinarily a matter for the court to determine in the context of a pre-trial motion to suppress if counsel elects to file one. La.C.Cr.P. art. 703. This requirement insures that “all disputes over police conduct unrelated to the guilt or innocence of the accused are eliminated from the jury trial’ and thereby avoids unwarranted delay and jury confusion.”
 
 State v. Christian,
 
 26,589 (La.App. 2 Cir. 1/25/95), 649 So.2d 806, 808,
 
 writ denied,
 
 95-0791 (La.9/15/95), 660 So.2d 448.
 

 807 So.2d at 219-20. The Court recognized that “with the constitutional validity of the search not at issue, neither the state nor the defense had any particular need to delve in detail into the circumstances surrounding [the officer’s] seizure of the evidence.”
 
 Id.
 
 at 221. In the similar case of
 
 State v. Watson, supra,
 
 a police officer testified at trial explaining the circumstances which led to the seizure of drugs and defendant’s arrest. The defendant then testified, in contrast to the officer’s testimony, that the officers pulled him off his bike, questioned him and beat him before arresting him. The appellate court properly found the defendant was es-topped from raising the issue that the evidence should have been suppressed as counsel did not raise the issue in a motion to suppress; however, it reversed the conviction on an ineffective assistance claim.
 
 State v. Watson,
 
 99-0243 (La.App. 4 Cir. 5/3/00), 763 So.2d 713. This Court reversed, again finding an ineffective assistance claim was better reserved for post-conviction. We explained that a motion to suppress is required so that a full eviden-tiary hearing can be held to address the issue and that a defendant is not allowed to first bring these claims up after the State has rested its case:
 

 In this case, the question of the constitutional validity of the seizure of [the evidence] was not at issue in the trial court. Thus, when the State tried this matter, its witnesses were not required to elaborate on why they stopped the defendant. Accordingly, neither the State nor the defendant had any need to scrutinize the detailed circumstances surrounding the seizure of [the evidence] and explore the evidence attendant to that police action. Therefore, the trial testimony of [the ^officer] focused only on the State’s burden to establish beyond a reasonable doubt that the defendant possessed the heroin.
 

 817 So.2d at 84.
 

 That is similar to what happened in this case. Defendant never raised the
 
 *969
 
 claim to the trial court in a motion to suppress that the letter should have been suppressed because he asserted his right to counsel when approached by police on Sept. 10 or the police misled him to thinking he did not have a lawyer. Although the burden of proof was on the State on the trial of the motion to prove its admissibility, the defendant must raise all grounds for suppression of the evidence that are knowable or available at that time. The defendant bears this burden in order to give the State adequate notice so that it may present evidence and address the issue at trial on the motion. Because Mon-tejo did not raise these grounds in a motion to suppress or allege facts supporting those grounds, the State had no need to put on evidence tending to show that defendant never made a clear assertion of his right to counsel or that the police never misled him. It simply put on evidence at the motion hearing as required by La. C.Cr.P. art. 703(D) and La. R.S. 15:451 that the letter was admissible, and put on evidence at trial as required by La.C.Cr.P. art. 703(G) concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement. Thus, the officers only testified at the suppression hearing and at trial that basically they asked if he had a lawyer, he said no, and then they read him his rights. It was not until the defendant testified at trial that he told the police he thought he had a lawyer and they told him he did not, that this potential
 
 Edwards
 
 violation and waiver issue was ever even alluded to. The State had no need, and was not required, to rebut this testimony because the evidence had already been admitted and it had never been claimed that the letter was obtained illegally on those grounds.
 
 See State v. Joseph,
 
 434 So.2d 1057, 1061, n. 3 (La.1983) (where defendant testified at trial that confession was beaten out of him and court had already ruled the statement was admissible in motion to suppress, because that ruling was binding at trial under La.C.Cr.P. art. 703, the state was not obligated to present rebuttal evidence to “rehabilitate” the confession).
 

 As stated earlier, the Supreme Court recognized in remanding the matter that “Montejo’s testimony came not at the suppression hearing, but rather only at trial, and we are unsure whether under state law that testimony came too late to affect the propriety of the admission of the evidence.” The defendant argues under Louisiana law, in reviewing the trial court’s ruling on a defendant’s motion to suppress, this Court has stated that it will look to the totality of the evidence presented at the motion to suppress hearing and the trial.
 
 State v. Burkhalter,
 
 428 So.2d 449, 455 (La.1983);
 
 State v. West,
 
 408 So.2d 1302, 1308 (La.1982) (“Although the state put on no evidence at the hearing on the motion to suppress, we look to the totality of the evidence produced both at that hearing and at trial when we assess whether the state has carried its burden”). However, this jurisprudential rule will only be applied where the defendant has filed a motion to suppress alleging a statement was inadmissible on a specific constitutional ground and later a reviewing court looks to his trial testimony, in addition to the testimony presented at the motion hearing, to determine whether the motion to suppress should have been granted on those grounds. The jurisprudential rule is not applied where the grounds for suppression were not asserted in the motion to suppress.
 
 [17]
 
 We have never allowed a defen
 
 *970
 
 dant to allege facts for the first time in trial testimony which would support a new argument for suppression of evidence, and have a reviewing court consider those 12f,facts in determining whether the district court should have granted a motion to suppress on grounds that were never argued to, or considered by, the district court. This is prohibited by La.C.Cr.P. arts. 703 and 841 and would allow rejection of the district court’s determinations at the suppression hearing without any indication of abuse of discretion.
 
 [18]
 
 We agree with the State that “the entire criminal justice system will become chaotic if the Court allows defendants to withhold testimony which they allege is relevant to a suppression issue until the end of trial after the evidence has been admitted, then raise the issue on appeal, when the trial court has had no opportunity to rule with all evidence before it.”
 

 In summary, under state law cited above, a defendant must allege the grounds on which he claims that evidence should be suppressed in a motion to suppress: “Failure to file a motion to suppress evidence in accordance with this Article prevents the defendant from objecting to its admissibility at the trial on the merits
 
 on a ground assertable by a motion to suppress.”
 
 La.C.Cr.P. art. 703(F). The only exception to this is if “opportunity therefor did not exist or neither the defendant nor his counsel was aware of the existence of the evidence
 
 or the ground of the motion,
 
 or unless the failure to file the motion was otherwise excusable.” La. C.Cr.P. art. 703(C).
 

 Thus, the answer to the Supreme Court’s query regarding whether defendant’s testimony came too late to affect the admissibility of the evidence because it came at trial, and not at the suppression hearing, is tied to the rules governing the motion to suppress, and depends upon whether the defendant or his counsel were aware of the “ground of the motion” at the time when
 
 Jackson
 
 was still good law. The Supreme Court expressed its opinion that “Montejo should be given an opportunity to contend |a7that his letter of apology should still have been suppressed under the rule of
 
 Edwards
 
 ” and that “Montejo understandably did not pursue an
 
 Edwards
 
 objection, because
 
 Jackson
 
 served as the Sixth Amendment analogy to
 
 Edwards
 
 and offered broader protections.”
 
 Montejo, supra,
 
 129 S.Ct. at 2091. The Supreme Court further stated that “Mon-tejo may also seek on remand to press any claim he might have that his Sixth Amendment waiver was not knowing and voluntary,
 
 e.g.,
 
 his argument that the waiver was invalid because it was based on misrepresentation by police as to whether he had been appointed a lawyer,
 
 cf. Moran [v. Burbine],
 
 475 U.S. [412] at 428, 429, [106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) ].”
 
 Id.,
 
 129 S.Ct. at 2091-92. However, under state law, the defendant does not get a second chance to assert arguments on appeal that he could have asserted to the trial court in a motion to suppress.
 
 [19]
 

 
 *971
 
 Regarding the potential
 
 Edwards’
 
 claim, as Montejo was in custody on September 10, his Fifth Amendment rights were implicated regardless of whether the Sixth Amendment had also been violated.
 
 [20]
 
 As the Supreme Court stated, “the right to have counsel during custodial interrogation ... [is] guaranteed (once the ^adversarial process has begun) by
 
 two
 
 sources of law” and it is “irrelevant” “that the doctrine established by
 
 Miranda
 
 and
 
 Edwards
 
 is designed to protect Fifth Amendment, not Sixth Amendment, rights.”
 
 Montejo, supra,
 
 129 S.Ct. at 2090. The Supreme Court explained that the protections of
 
 Miranda/Edwards/Minnick
 

 [21]
 

 overlap with the protections offered by
 
 Jackson
 

 [22]
 

 and operate before the defendant’s arraignment as well as after his arraignment.
 
 Id.,
 
 129 S.Ct. at 2090. Thus, the claim Montejo now wants to raise under
 
 Edwards
 
 existed in addition to
 
 Jackson
 
 and provided an independent basis to suppress the apology letter; therefore, if Montejo had this claim to make, he was required to assert it in a motion to suppress. La. C.Cr.P. art. 703. Although defendant vigorously pressed a Fifth Amendment claim regarding the earlier videotaped interrogations, the protections of the Fifth Amendment did not cease when Montejo attended the 72-hour hearing a few days later on September 10, yet defendant did not contend at the suppression hearing that, before agreeing to accompany the officers on the evidence seeking expedition, he requested counsel but was worn down through badgering into accompanying the officers.
 

 
 *972
 
 The need to raise this claim is especially true in light of the fact that Montejo’s
 
 Jackson
 
 claim was particularly tenuous under Louisiana law, given that he stood mute at the 72-hour hearing, and cases from this Court and the United States Court of Appeals for the Fifth Circuit had interpreted
 
 Jackson
 
 to mean that in order for |2c|Sixth Amendment protections of
 
 Jackson
 
 to apply, there must have been a request for, retention of, or acceptance of counsel at the initial appearance.
 
 State v. Carter,
 
 94-2859 (La.11/27/95), 664 So.2d 367, 383 (“[sjomething more than mere mute acquiescence in the appointment of counsel is necessary to show the defendant has asserted his right to counsel sufficiently to trigger the enhanced protection provided by
 
 Michigan v. Jackson’s
 
 prophylactic rule”);
 
 Montoya v. Collins,
 
 955 F.2d 279 (5th Cir.1992) (the rule of
 
 Jackson
 
 is only invoked when a defendant makes “an actual, positive statement or affirmation of the right to counsel” at the time counsel is appointed),
 
 cert denied,
 
 506 U.S. 1036, 113 S.Ct. 820, 121 L.Ed.2d 692 (1993);
 
 cf Patterson v. Illinois,
 
 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) (indictment does not trigger Sixth Amendment protections unless defendant indicates he wants the assistance of counsel). Thus, under controlling state law precedent interpreting
 
 Jackson,
 
 a defendant who does not assert his right to counsel at a court appearance where counsel is appointed can be subsequently questioned by police after a valid
 
 Miranda
 
 waiver; therefore, Monte-jo’s
 
 Jackson
 
 claim could not have been valid on the grounds he asserted in the motion. Given the precariousness of his
 
 Jackson
 
 claim, he clearly should have, and would have, asserted that he made a clear assertion of his right to counsel but was worn down by badgering, if he also believed this had occurred.
 

 In fact, defendant has previously asserted quite the opposite. In brief to this Court on original hearing, defense counsel conceded that “[b]y Mr. Montejo’s own admission his request for counsel [on September 10] was not a clear assertion or invocation of his ‘right.’ ” Indeed, the Supreme Court directed in this case, “[o]ur cases make clear which sorts of statements trigger
 
 [Edwards’]
 
 protections,
 
 see Davis v. United States,
 
 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) ...” Inn
 
 Montejo, supra,,
 
 129 S.Ct. at 2091,
 
 [23]
 
 and, in our view, the statements Montejo made did not trigger these protections. In
 
 Davis,
 
 the Supreme Court described with specificity the requirements for a clear assertion of the right to counsel:
 

 Invocation of the
 
 Miranda
 
 right to counsel “requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of attorney.”
 
 McNeil v. Wisconsin,
 
 501 U.S. at 178, 111 S.Ct. at 2209. But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect
 
 might
 
 be invoking the right to counsel, our precedents do not require the cessation of questioning. See
 
 ibid.
 
 (“[T]he
 
 likelihood
 
 that a suspect would wish counsel
 
 *973
 
 to be present is not the test for applicability of
 
 Edwards
 
 ”);
 
 Edwards v. Arizona, supra,
 
 451 U.S., at 485, 101 S.Ct., at 1885 (impermissible for authorities “to reinterrogate an accused in custody if he has
 
 dearly asserted
 
 his right to counsel”) (emphasis added).
 

 Rather, the suspect must unambiguously request counsel.
 

 512 U.S. at 459, 114 S.Ct. 2350.
 
 [24]
 
 In
 
 Davis,
 
 the Supreme Court found that the statement “Maybe I should talk to a lawyer” was not a clear and unambiguous request for counsel. Nor, as defense counsel has previously recognized, did Monte-jo’s alleged statement to police that “Well, and I don’t, I don’t, I don’t really want to go |siwith you ... I got a lawyer appointed to me.... Yeah, I think I got a lawyer appointed to me” constitute an “unambiguous request for counsel.” It is more properly characterized as a statement that the defendant might want counsel, or an “ambiguous or equivocal” request for counsel, or an indecisive request for counsel, each of which the
 
 Davis
 
 Court stated would be insufficient to trigger
 
 Ediuards’
 
 protections against further questioning. Thus, even if his testimony could be considered in determining the letter’s admissibility and was accepted as true, this request did not meet the criteria described in
 
 Davis.
 

 As to the waiver issue, the Supreme Court instructed: “Montejo may also seek on remand to press any claim he might have that his waiver was invalid because it was based on misrepresentations by police as to whether he had been appointed a lawyer,
 
 c.f, Moran,
 
 475 U.S. at 428, 429, 106 S.Ct. 1135.”
 
 Montejo, supra,
 
 129 S.Ct. at 2092. The Court added that “[t]hese matters have heightened importance in light of our opinion today.”
 
 Id.
 
 However, although more important now, the waiver argument is based on jurisprudence that was equally in force at the time of the motion. Further, as Montejo’s
 
 Jadcson
 
 claim was questionable under the grounds he asserted in the motion, i.e., mere appointment of counsel invokes the protections of
 
 Jackson, contra, State v. Carter, supra,
 
 an invalid waiver would have been a critical argument. With or without
 
 Jackson,
 
 if in fact the officers misled him or kept him from counsel, Montejo had an independent argument under Moran
 
 [25]
 
 and
 
 *974
 
 numerous other Supreme |S2Court cases that his Fifth or Sixth Amendment rights were violated by that police action.
 
 [26]
 
 In fact', he may have had an even stronger case under Louisiana law, because conduct approved by federal jurisprudence might not be permitted under state law.
 
 See State v. Reed,
 
 390 So.2d 1314, 1315 (La. 1980) (“when the government interferes with the Sixth Amendment right to counsel by giving erroneous information to a defendant’s attorney, it cannot take advantage of any time gained by that ploy to obtain incriminating statements”);
 
 State v. Trevathan,
 
 414 So.2d 316, 318-19 (La.1982) (violation of Sixth Amendment for police to interrogate defendant after his attorney instructed police not to interrogate him without counsel present or take him to the scene where the victim’s body was found);
 
 State v. Hattaway,
 
 621 So.2d 796, 798 (La.1993) (police violated defendant’s Sixth Amendment rights when they unlawfully removed him from the trial venue without notice to his court appointed counsel and transported him to another parish, confining him there without means of contacting his attorney, friends, family, or potential defense witnesses),
 
 overruled on other grounds, State v. Carter, supra.
 

 Montejo asserted no arguments to the trial court on a motion to suppress that his subsequent waiver was unknowing or involuntary because of misrepresentations made by police, in spite of this strong, existing case law in support of that claim. The waiver issue was highly relevant, especially in light of the fact that his
 
 Jackson
 
 claim was so tenuous. In fact, the waiver issue was clearly contemplated by defendant before
 
 Jackson
 
 was overruled, as he argued on original hearing to this Court that his waiver | S3was unknowing, albeit for slightly different reasons.
 
 [27]
 
 If Montejo had any claims that he did not make a knowing, intelligent, and valid waiver of the right to counsel when he was approached by police on September 10 because he was misled and lied to by police, those claims would have been just as valid under the law as it stood then as they would be now, and he clearly would have, and should have, asserted those claims had facts existed to support them claims.
 

 
 *975
 

 Harmless Error
 

 The erroneous admission of a confession is a trial error subject to harmless error analysis.
 
 Arizona v. Fulminante,
 
 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991);
 
 State v. Koon,
 
 96-1208 (La.5/20/97), 704 So.2d 756, 763-64;
 
 State v. Tart,
 
 93-0772 (La.2/9/96), 672 So.2d 116, 128-29. An error is harmless beyond a reasonable doubt if it is unimportant in relation to the whole and the verdict rendered was surely unattributable to the error.
 
 Chapman v. California,
 
 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967);
 
 see also State v. Koon, supra; State v. Tart, supra.
 

 The following evidence, as described in our opinion on original hearing, was presented to the jury.
 
 See State v. Montejo, supra,
 
 974 So.2d at 1241-1249. According to the State, the crime was planned by Jerry Moore
 
 [28]
 
 and perpetrated by I^Montejo with the assistance of Montejo’s 19-year-old step-brother, Eric Gai.
 
 [29]
 
 At trial, witnesses described the victim as a person who followed a well-known and predictable routine, and who was killed on the day he transported the payroll. The victim’s widow described her husband’s habits for the jury, including how he transported money, deposits, and checks in the trunk of his vehicle on Thursdays, which was the day he did payroll, and how he could usually be found at home between four to six p.m. Another employee, Birdie Sue Morrow, confirmed that the victim paid his employees on Thursdays. Typically on Thursdays, the Ferrari family would meet at a local restaurant sometime after 6:00 p.m. for a family dinner.
 

 The victim’s adult son, Lewis Ferrari III, testified that Moore was familiar with his father’s routines. Several witnesses described Moore’s recent association with the defendant and his long-term but rocky relationship with the victim. The victim’s widow testified that Moore had performed mechanical work for the family dry cleaning business for about 10 years but that he became unreliable. Lewis F. Ferrari III confirmed that Moore was capable of good electrical work but that he had become very unreliable, and he said that he objected to his father continuing to employ Moore. Both of these witnesses testified that Moore recently lost his driver’s license and he had hired Montejo, whom he met while hitchhiking, to transport him. The victim’s son described Montejo’s car as a blue van with a distinctive chrome cattle guard in the front.
 

 Morrow testified that she saw Moore and the victim argue on two occasions: once about one month before and again on the day of the murder. On both occasions, she heard the victim tell Moore that he was not afraid of him. She said that Moore left after the most recent argument by entering the passenger side of the blue van that |35routinely transported him. Hugh Dillard, who owns and operates a poboy shop next to the victim’s dry cleaning business, also watched Moore and the victim argue loudly outside his shop on the morning of September 5, 2002.
 

 The victim’s widow testified that they lived in a quiet neighborhood on Rue La-mothe in Slidell. Several neighbors noticed Montejo’s blue van, -with its distinctive chrome cattle bar, in the neighborhood
 
 *976
 
 the time of the murder. Stacy Stubben-ville, who lived on Rue Lamothe, was driving home at about 4:15 p.m. on the day the victim was murdered when she noticed an unusual blue van with a chrome cattle bar on the front. The van had a driver and a passenger. Larry Landry, another neighbor, also noticed the blue van in the neighborhood at some time between three to five p.m. on the day of the murder. Jo Ann Diaro lived near the Ferraris. On the day of the murder, she arrived home at 5:00 p.m. and left again at 5:30 p.m., when she noticed two vehicles: a blue van (driven by a young white male with brown hair) driving very quickly down the street and the victim’s white Lincoln (whose driver she could not see) backing out of the Fer-raris’ driveway. The two vehicles almost collided when the Lincoln cut off the van and they stopped briefly together before exiting the neighborhood. Finally, Janice Dow, who also lived near the Ferraris, saw the blue van driving very quickly through the neighborhood twice on the day of the murder: once at 4:30 p.m. and again at about 5:30 p.m. with the Ferraris’ white Lincoln behind it.
 

 The State presented physical evidence, which included the undisputable presence of Montejo’s DNA under the victim’s fingernails. Dr. Dudhir Sinha, president and laboratory director of ReliaGene, testified as an expert in molecular biology and DNA analysis that he tested scrapings from beneath the victim’s fingernails and a reference sample from the defendant. A scraping from the victim’s right hand contained only the victim’s DNA; a scraping from the victim’s left hand contained a mixture of the victim and defendant’s DNA. Dr. Sinha also concluded that |S6the victim intentionally scratched defendant because sample characteristics ruled out DNA transfer by coincidental contact.
 

 The victim’s body was examined at the crime scene as well as later autopsied by Dr. Mike Difatta, chief deputy coroner for St. Tammany Parish. Dr. Difatta testified as an expert in forensic pathology that the victim sustained two gunshot wounds: one superficial and one fatal. According to Dr. Difatta, the victim was shot once in close contact in his right side and again in his right eye from a distance of at least three feet. The victim would have died within seconds of the gunshot to his head, which the evidence suggested was fired between 4-5 p.m. Dr. Difatta saw no evidence to suggest that the victim was struck in the head with a blunt object.
 

 Sergeant Carl Fullilove testified as an expert ballistics and firearms examiner that he examined a bullet and bullet fragments found at the crime scene but noted that the murder weapon was not found in this case. He said that a single intact bullet was extracted from the wall at the crime scene that was similar to the victim’s own revolver ammunition, but without the murder weapon it was only possible to infer that the victim was probably killed by a shot from a revolver.
 

 James Folse of the St. Tammany Parish Crime Lab collected forensic evidence at the victim’s home. He extracted an intact bullet from the dining room wall and recovered bullet fragments from the living room near and underneath the sofa. He obtained only one useful fingerprint from the victim’s residence, which was left by a person who was never identified. Susan Downey of the St. Tammany Parish Crime Lab documented the crime scene at the victim’s home. She observed an intact bullet in a door casing that appeared to have been shot through the victim and bullet fragments in the concrete slab beneath the sofa. She testified that the victim’s sofa had a bullet hole and the characteristic indentation of a revolver. She
 
 *977
 
 described the blood |S7pooling, characterized the blood spatter as “high velocity,” and she saw no signs of struggle but noticed that the bedroom was in disarray.
 

 Folse also assisted in processing Monte-jo’s van and the victim’s Lincoln as well as evidence seized from Gai. He photographed the Lincoln, which was found in an isolated location and later processed at the crime lab by Sergeant Fullilove. The area near this vehicle was searched but no weapon was found. Sergeant Fullilove testified that he found one identifiable partial palm print on the victim’s Lincoln, which belonged to the victim, and that the accelerator pedal of this vehicle tested positive for blood. Inside Montejo’s van, Folse found receipts for stereo equipment dated September 6, 2002, $322 in cash, and gloves. No blood was found inside the van or on the defendant’s clothing. Detectives delivered a seat cushion to the crime lab that was taken from Gai, which Folse documented, that concealed $832. Folse identified photographs of the victim’s ear, the area in which it was found, and Montejo’s van, which were admitted without objection, and some of which were projected during his testimony.
 

 After he was taken into custody, Monte-jo was interviewed by police from about 4:30 p.m. until about 11 p.m. on September 6, 2002, and again between approximately 3:00 and 4:00 a.m. on September 7, 2002. The centerpiece of the state’s case was approximately four hours of this videotaped police interrogation during which Montejo slowly made increasingly incriminating statements until he finally admitted that he shot the victim who had unexpectedly returned home and interrupted Mon-tejo’s burglary.
 

 At the beginning of the interview, Mon-tejo related his first version of the crime, in which he claimed that his only involvement was in driving Moore to the victim’s home and leaving him there without knowing that Moore was going to rob and kill the victim. Confronted with the potential that his DNA might be found inside the home, InRMontejo related his second version of the crime. He said that the victim was not home when he arrived at about 5 p.m. with Moore, who told him that they could wait inside. After about 10 minutes; Moore started ransacking the residence, so Montejo left. He became disoriented and was briefly lost in the neighborhood. After he regained his bearings, he saw Moore drive away in the victim’s car. Montejo attempted to answer the detectives’ follow-up questions, but abandoned this story for a third version, after detectives suggested that Moore would blame Montejo and confronted him with the possibility that the forensic evidence would prove that the victim scratched his neck or that he was present when the murder weapon was fired. In the third version, Montejo did not leave when Moore (who was wearing gloves) ransacked the home. Instead, he and Moore hid when the victim arrived. Moore struck the victim over the back of the head with the gun and Montejo tried to run. The victim turned and flailed wildly, scratching Montejo, and Moore shot the victim, who remained standing. As Montejo fled, he heard a second shot. Montejo became briefly lost in the neighborhood and saw Moore drive away in the victim’s car. In response to demands for corroborating physical evidence, such as the location of the murder weapon or any stolen property, and again confronted with forensic evidence, Montejo invoked his right to counsel but quickly retracted his request.
 

 After Montejo invoked and revoked his right to counsel, defendant was again read his
 
 Miranda
 
 rights and signed written waivers of those rights. Montejo then retracted his claims that Moore killed the
 
 *978
 
 victim, and told a fourth version of the crime as a botched burglary. He said that Moore persuaded him to burglarize the victim’s home, which he believed would be unoccupied, unlocked, and full of money, and that he agreed to do so because his rent was due. However, he found the victim’s gun inside the home and, when the victim came home and surprised him, Mon-tejo hit him in the head with the gun, warned him to stay back, fired a warning shot, and when that ^failed, shot and killed the victim, before firing the weapon into the couch to un-cock it, and throwing the gun in the lake. After detectives confronted him with the fact that two vehicles left the crime scene together, Montejo retracted this story and told a fifth version of the crime, in which he blamed a person he knew only as “D.P.,” an African-American male from the Fischer projects, whom he claimed would be impossible to locate. Montejo said he was introduced to D.P. by Moore, who wanted defendant and D.P. to rob the victim. Montejo agreed because his rent was overdue so he met D.P. at the Rally’s and they went to the victim’s home. After detectives confronted Montejo with the implausibility of this story, they terminated the interview and the video stops. The defendant was arrested and transported to jail.
 

 Montejo was interviewed for about four hours later in the early morning on September 7, 2002, and that interview was also videotaped and shown to the jury. During this interview, Montejo told his sixth version of the crime. He said that Gai, who did not know that Montejo planned to burglarize the home because his rent was overdue, dropped him off at the victim’s house at about 5:30 p.m. and was instructed to return later. Moore had told Monte-jo that the house was unlocked, contained a lot of money, and would be unoccupied because the family would be at dinner. Inside the home, Montejo found a gun, which he picked up to use to scare anyone away who might come home. When the victim returned 10 minutes later, Montejo hit him over the head with the gun, which failed to knock him out, and then fired a warning shot that he intended to miss the victim. However, the victim continued to struggle with him so Montejo shot him. Montejo fled in the victim’s vehicle, and found Gai and told him to follow him. Montejo threw the gun out of the window into the lake from the Highway 11 bridge, burned the victim’s money bag, threw his gloves out of the window on the highway, gave $800 to Gai, gave some money to Moore, and used his share of the money to pay bills. These videos were played for the jury at trial.
 

 14f|The defendant also testified at trial. He testified that he falsely confessed during the videotaped interrogation because he was exhausted and trying to satisfy the detectives. He then told a seventh version of the crime, which was an elaborated variation of the fifth in which D.P. was first introduced. Defendant testified that on Friday of the week before the murder, when he went to pick up money from the victim on behalf of Moore, the victim introduced him to D.P. and suggested they all meet next week to discuss Montejo working as D.P.’s, rather than Moore’s, driver. Montejo described D.P. as an African-American male, about 5' 8"’ tall, with his initials tattooed in an Old English script on his forearms, who lived in the Fischer Projects. The next week, on the day before the murder, the victim told Montejo to come to his house the next day before 6 p.m. The next day, Gai dropped him off at the victim’s house, and D.P. answered the door. Inside the residence, D.P. displayed a gun, grabbed Montejo, and took his wallet, from which D.P. retrieved Montejo’s license, which he scrutinized. D.P. commented that he now knew where Montejo
 
 *979
 
 lived, asked him if he had a big mouth, forced him to the floor, placed the gun against his head, threatened to kill or have killed Montejo or a member of Montejo’s family, and fired the gun into the couch to intimidate him. The victim then arrived and D.P. instructed Montejo to hide. When the victim entered the kitchen, D.P. hit him, which caused the victim to fall onto Montejo. The victim turned around and swung at D.P., who fired at him, and the victim then threw his arms up and backed up. D.P. then threatened them both and demanded the victim’s “big stash.” D.P. took Montejo’s wallet again, placed some of the victim’s money in it before returning the wallet to Montejo, instructed the victim to give Montejo his car keys, threatened Montejo’s family again, told him to leave, and held the gun to the victim’s face. As Montejo left, he heard D.P. threaten the victim and the victim assure D.P. that he would cooperate. Montejo closed the door, heard a gunshot, and fled in the victim’s car but became temporarily lost. Montejo then |41found Gai but almost collided with him trying to get his attention. He instructed Gai to follow him and they abandoned the victim’s car on a dirt road. Montejo then told Gai what had happened and gave him the money that D.P. put in his wallet. He testified he did not contact the police because he believed D.P.’s threats.
 

 In light of the above evidence presented at trial, we find that regardless of whether the letter was admitted in violation of the Fifth or Sixth Amendment, the introduction of the letter was harmless. As stated above, an error is harmless beyond a reasonable doubt if it is unimportant in relation to the whole and the verdict rendered was surely unattributable to the error.
 
 Chapman, supra; State v. Koon, supra; State v. Tart, supra.
 
 When that standard is applied to the admission of an erroneously admitted confession where other confessions or statements were properly admitted, courts have examined the extent to which the improperly admitted confessions are cumulative or less detailed, the amount of inculpatory corroborating evidence presented at trial, whether the improperly admitted evidence is necessary to corroborate any aspect of the crime, and the existence of any connection between the properly admitted and improperly admitted statements.
 
 See, e.g., Zappulla v. New York,
 
 891 F.3d 462, 473 (2nd Cir.2004) (finding that the confession resolved the apparent conflict between the testimony of the two witnesses regarding motive and was therefore not harmless);
 
 Cooper v. Taylor,
 
 103 F.3d 366, 370-71 (4th Cir.1996) (finding that “when viewing the record as a whole, we simply recognize the obvious power of the two other confessions, together with the other overwhelming evidence of guilt, and conclude that [the admission of the third confession was harmless])”;
 
 Commonwealth v. Markman,
 
 591 Pa. 249, 916 A.2d 586, 603 (2007) (noting that the “confession painted Appellant as the individual who directed all of the crucial events to accomplish [the crimes, and therefore,] the prejudicial effect of [the] statement was 14?not de minim-is”);
 
 McCoy v. United States,
 
 890 A.2d 204, 208-09 (D.C.2006) (noting that the improperly admitted confession was only “partially cumulative of other testimony [and] presented the jury with two significant pieces of evidence [that were] not found anywhere else in the government’s case”);
 
 State v. Rezk,
 
 150 N.H. 483, 840 A.2d 758 (2004) (finding that the “confessions were merely cumulative of and inconsequential in relation to [the other evidence presented])”;
 
 State v. Johnson,
 
 136 N.M. 348, 98 P.3d 998, 1009 (2004) (finding that “we must carefully evaluate the degree to which the inadmissible evidence might have operated to
 
 corroborate
 
 other
 
 *980
 
 similar evidence of guilt”);
 
 Hill v. State,
 
 2009 WL 2145833 *7 (Tex.App.2009) (examining “the confession’s content and any collateral implications stemming from the confession’s admission” and noting that “[t]he State placed little emphasis on the erroneously admitted confession”);
 
 Davies v. State,
 
 730 N.Ed.2d 726, 735 (Ind.App.2000) (noting that the improperly admitted statement was “very general” in comparison to the “much more detailed” properly admitted confession).
 

 As described above, in the properly admitted videotaped interrogation, Montejo told several increasingly incriminating versions of the crime. These included two different variations of the botched burglary story, both very detailed. That same botched burglary story was described in the apology letter, but in more general terms and very briefly. The apology letter contains no assertions (other than the expressions of remorse) that do not also appear on the videotape. The apology letter is not the sole proof of any element of the crime nor does it provide essential corroboration. The apology letter is unconnected to the properly admitted confessions made in the videotaped interrogation, which took place several days before the letter was written. In addition, while it was introduced in the State’s case in chief, references to the letter by the State were minimal and more akin to impeachment, whereas the defense | ¿-¡referred to the letter at length in an attempt to diminish the credibility of the police by alleging that the police forced him to write the letter and told him what to say. Finally, the apology letter is inconsequential in comparison to the properly admitted videotaped confession, Montejo’s own incredible trial testimony, the eyewitnesses who saw Montejo’s car flee the vicinity of the crime, evidence of the proceeds of the crime found on Montejo and Gai, the testimony concerning motive, and the presence of Montejo’s DNA under the victim’s fingernails which an expert testified was the result of the victim intentionally scratching the defendant. Under these circumstances, we find that any error in admitting the apology letter was harmless beyond a reasonable doubt as it was unimportant in relation to the whole and the verdict rendered and sentence imposed was surely unattributable to the error.
 

 CONCLUSION
 

 A new basis for an objection cannot be raised for the first time on appeal. La. C.Cr.P. art. 841. A defendant adversely affected by his confession or other statement can file a motion to suppress the statement on any constitutional grounds and must file the motion in accordance with the date set by the trial judge for such pre-trial motions. In order for the trial court to hold a hearing, the defendant must allege facts that would require the granting of relief. The requirement of a separate motion hearing ensures that all disputes over police conduct unrelated to a defendant’s guilt or innocence are eliminated from the jury trial and avoids unwarranted delay and jury confusion. At the hearing, the State bears the burden of proving the admissibility of a confession, and must specifically rebut any allegations the defendant makes regarding police misconduct. A defendant must assert all grounds for suppressing the evidence of which either defendant or defense counsel were aware. A trial court’s ruling on a motion to suppress is binding at trial and the defendant is prohibited from objecting to the evidence’s admissibility on a ground that could have been, but was not, |44asserted in the motion to suppress. In reviewing a trial court’s ruling on a motion to suppress, although a reviewing court may look to trial testimony in addition to testimony at the motion hearing in consid
 
 *981
 
 ering whether the district court’s ruling was correct, a reviewing court will not look to trial court testimony in support of a ground for excluding the evidence that was not asserted in a motion to suppress.
 

 In this case, defendant’s testimony at trial that he asserted his right to counsel when police approached him on September 10, 2002, and that his subsequent waiver was invalid because the police misled him into thinking he did not have an attorney, comes too late for consideration as to the admissibility of that evidence because those grounds for suppressing the evidence were available, but were not asserted by defendant in a motion to suppress.
 

 Finally, even assuming that the letter was improperly admitted, its admission at trial was harmless. The letter was cumulative of other properly admitted evidence, contained no assertions not contained in the much more detailed videotaped confessions, did not provide the sole proof of any element of the crime, and was inconsequential in comparison to the properly admitted videotaped confession, Montejo’s own incredible trial testimony, the eyewitnesses who saw Montejo’s car flee the vicinity of the crime, and the presence of Montejo’s DNA under the victim’s fingernails.
 

 DECREE
 

 For the reasons assigned herein, and having once affirmed the defendant’s conviction and death sentence, this Court, after remand from the United States Supreme Court, again affirms the defendant’s conviction and death sentence. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been |4fidenied certiorari, fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any State post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed in the state courts.
 

 AFFIRMED.
 

 *
 

 Retired Judge Phillip C. Ciaccio, assigned as Justice ad hoc, sitting for Chief Justice Catherine D. Kimball.
 

 [1]
 

 . A description of these statements is found in the Harmless Error section of this opinion,
 
 infra,
 
 pp. 977-78.
 

 [2]
 

 . The text of the letter is as follows:
 

 Ms. Ferrari,
 

 This is very hard to put in the right words but I will try hard. My soul is feeling you very much. If I could rwind [sic] time I wish that bullet would of hit me. Please finish reading. I really want you to know I had no intention on his death and I am in a lot of true pain I’m so sorry I can picture your heart dropping at sight it is eating me up inside so bad. I try to talk to Loue [sic] every day to say I’m sorry and wish I could let you feel my emotion to know truely [sic] how sorry and how bad this is tearing me up. I promise you I didn't cold blood kill Mr. Loue [sic] if I could change places I would be dead. Please be strong only God really knows why this happen you a beautiful woman and I’m huting [sic] more than you would really expect to know I caused that I did crimes before but I’m really not as harmful as what happen please forgive me Ms. Ferrari I prey for you to be strong and get through I will prey every day I’m accepting God for once in my life and begging for forgiveness I’m so sorry please forgive me I was going for a simple burgu-lary [sic] in and out that someone put me on and instead I found the gun so I thought if some reason some one does come in I can scare with the gun and run but he wasn’t scared I swear I tried to just run Ms. Fearri [sic] but he wouldn’t let me I even fired a warning which skint [sic] him on the side but he still kept coming strong I couldn't see then the shot and he flew back I ran with no ride I grabed [sic] his keys I almost shot myself the gun was cocked back agin [sic] and I didn't know how thats [sic] how scared I was so I shot into the couch I know you needed to know this Ms. Ferri [sic] and may God make you strong pleases
 
 *955
 
 I need your forgiveness Ms. Ferri [sic! I’m more than sorry for what happen please forgive me please I'm sorry I lost my life too, my baby my beautiful girl I'm so sorry, [signature]
 

 Please forgive me Miss. Ferri [sic] may God be with you and make you strong because hes [sic] killing me inside.
 

 9-10-02 8:30 p.m.
 

 [3]
 

 . A 72-hour hearing is a preliminary hearing required under state law, in which the defendant is required to be brought before a judge within 72 hours of his arrest for the purpose of appointment of counsel. La.C.Cr.P. art. 230.1(A). The court may also determine the bail or review a prior determination of the bail amount at that time.
 

 [4]
 

 . The question presented by Montejo to the Supreme Court was:
 

 When an indigent defendant’s right to counsel has attached and counsel has been appointed, must the defendant take additional affirmative steps to “accept” the appointment in order to secure the protections of the Sixth Amendment and preclude police-initiated interrogation without counsel present?
 

 Montejo v. Louisiana,
 
 Petition for Certiorari, No. 07-1529 (June 5, 2008).
 

 [5]
 

 .The Supreme Court found
 
 Jackson
 
 to be "unworkable” and, in its place, found that the rules that presently preserve the Fifth Amendment right to counsel also would suffice to protect the Sixth Amendment right and thus render
 
 Jackson
 
 "superfluous”:
 

 Under the
 
 Miranda-Edwards-Minnick
 
 lines of cases (which is not in doubt), a defendant who does not want to speak to the police without counsel present need only say as much when he is first approached and given the
 
 Miranda
 
 warnings. At that point, not only must the immediate contact end, but "badgering” by later requests is prohibited. If that regime suffices to protect the integrity of “a suspect's voluntary choice not to speak outside his lawyer's presence” before his arraignment, it is hard to see why it would not also suffice to protect that same choice after arraignment, when Sixth Amendment rights have attached.
 

 Montejo,
 
 129 S.Ct. at 2090 (citation omitted).
 

 [6]
 

 . The following review relates only to the issues on remand. For a complete discussion of the facts of this case, see our opinion on original hearing,
 
 State v. Montejo, supra,
 
 and pages 974-79 of this opinion on remand,
 
 infra.
 

 [7]
 

 . The motion to suppress stated as follows:
 

 Defendant moves to suppress for use as evidence all oral or written inculpatory statements obtained from defendant by all law enforcement officers or other agents of the State in the above-captioned cause.
 

 All of said confessions and other inculpa-tory statements are inadmissible in evidence because they were not made by defendant to said law enforcement officers or anyone else freely and voluntarily, but were made under the influences of fear, duress, intimidation, menaces, threats, inducements, and promises, and/or without mover having been advised of his Constitutional rights to remain silent, right to counsel, etc.
 

 [8]
 

 . Although Detective Hall did not mention this in his testimony, Montejo also drafted the letter of apology at this time.
 

 [9]
 

 . A sally port is a secured area with controlled ingress and egress which serves as a passageway for persons entering or exiting the jail.
 

 [10]
 

 . Montejo’s DNA was found under the victim’s left fingernail.
 
 See infra,
 
 pp. 975-76.
 

 [11]
 

 . Deputy Morris had already testified on behalf of the State.
 

 [12]
 

 . At trial, defendant testified that he was innocently present in the victim’s home when the crime was committed by a black male from the Fisher Projects, who was known only by his tattooed initials "D.P.” D.P. forced Montejo at gunpoint to take some of the pro
 
 *963
 
 ceeds of the crime and then flee in the victim’s car as D.P. shot and killed Mr. Ferrari. According to Montejo, he initially thought it best to blame Jerry Moore and then later take the blame for the crime himself because D.P. was a dangerous man who knew where Mon-tejo and his family lived and who had threatened to kill them all if Montejo talked to police.
 
 See infra,
 
 pp. 40-41.
 

 [13]
 

 . Regarding the events of September 10, Montejo argued to this Court on original hearing only that his Sixth Amendment right to counsel had attached at the time of the 72-hour hearing and therefore police could not initiate questioning of him. He made no argument to this Court that he asked for a lawyer on September 10; however, he did argue that any subsequent waiver of his right to counsel was unknowing because he did not know an attorney had been appointed, referring to his trial testimony that the police told him he did not have an attorney.
 

 [14]
 

 . In the alternative, defendant claims that the record as presently constituted proves that the detectives obtained the letter by deceitfully keeping him from his appointed counsel in violation of
 
 Maine v. Moulton,
 
 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). Further, he alleges that his trial testimony was unrebutted and indicated a clear assertion of his right to counsel such that
 
 Edwards
 
 would have protected him from further interrogation, and that the State failed to prove any subsequent waiver was voluntary when viewed in the context of his entire interaction with police beginning on September 6, coupled with Det. Hall’s deceit in telling him he did not have a lawyer. In addition, Montejo argues that the
 
 Miranda
 
 form used on September 10 was inadequate because it indicated an attorney "will be appointed” in the future, when in fact an attorney had already been appointed. Finally, he characterizes the apology letter as a full confession that was the dispositive piece of evidence against him that can therefore not be found to constitute harmless error.
 

 [15]
 

 . “This statutory rule has its underpinnings in the Due Process Clause and it necessarily operates independently of any credibility determination the trial court may have made in ruling on the voluntariness of a statement as a matter of law.”
 
 State v. Williams,
 
 01-1650 (La. 11/1/02), 831 So.2d 835, 843 (citing
 
 Crane
 
 v.
 
 Kentucky,
 
 476 U.S. 683, 689, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986)). In
 
 Williams
 
 we found that the trial court erred in refusing to allow defendant to present additional testimony at trial concerning his request for counsel before he confessed. 831 So.2d at 843. The trial court found that the issue of voluntariness was decided at the motion to suppress and was therefore res judica-ta. We found that the evidence should have been allowed under La.C.Cr.P. art. 703(G) to determine the weight to be given the evidence.
 
 Id.
 

 [16]
 

 . In
 
 Jackson,
 
 the court found that while the defendant challenged the voluntariness of his
 
 *968
 
 confession, neither his written motion nor the evidence presented at the motion hearing alleged that the statement was involuntary because of his young age or because he was sleep deprived at the time of the statement. The defendant was not allowed to raise these new bases for suppression of his statement for the first time on appeal, and therefore, they were not properly before the appellate court.
 

 [17]
 

 . For instance, in
 
 Burkhalter,
 
 we stated that we would look to testimony presented at the molion to suppress and at trial; however, the testimony at trial was the same as that pre
 
 *970
 
 sented in support of the motion. In
 
 West,
 
 we looked to trial court testimony presented by the state because the state put on no evidence at the motion to suppress as required by La. R.S. 15:451.
 

 [18]
 

 . This would also potentially constitute a technical trap for an unwary prosecutor in a case like the instant one in which a defendant does not testify on a motion to suppress but reserves his claims of police misconduct for trial to undercut the weight given the statement by the jury. A prosecutor may not deem that testimony worthy of specific rebuttal in front of the jurors and may rest on general disclaimers by the officers involved in the interrogation.
 

 [19]
 

 . Montejo argues on remand that "to admit the statements now without holding a hearing on this issue, because he relied on
 
 Jackson,
 
 would be to default him for failing to
 
 *971
 
 foresee that the law would change, and would require future defense counsel to press claims in every instance based upon haphazard speculation that the law might change.” Presumably, Montejo would posit those same arguments in response to our ruling today. However, the jurisprudence Montejo relies on now in support of his claims was equally in force before
 
 Jackson
 
 was overruled and offered him the same protections independently of
 
 Jackson.
 
 Regardless of whether the law of
 
 Jackson
 
 changed, he still had these additional protections that he should have argued if facts existed to support those claims. Further, as explained
 
 infra,
 
 even though the case he relied on was overruled, it provided a dubious basis for success given the facts alleged; thus, if he had any alternative arguments, he had to make them for the district judge's consideration in determining admissibility.
 

 [20]
 

 .Under
 
 Edwards,
 
 once "an accused has invoked his right to have counsel present during custodial interrogation ... [he] is not subject to further interrogation by the authorities until counsel has been made available,” unless he initiates the contact. 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The
 
 Edwards
 
 rule is “designed to prevent police from badgering a defendant into waiving his previously asserted
 
 Miranda
 
 rights.”
 
 Michigan v. Harvey,
 
 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990). It does this by presuming his post-assertion statements to be involuntary, "even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards.”
 
 Montejo, supra,
 
 129 S.Ct. at 2085 (citing
 
 McNeil v. Wisconsin,
 
 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)).
 

 [21]
 

 . The Court explained that “[u]nder
 
 Miranda’s
 
 prophylactic protection of the right against compelled self-incrimination, any suspect subject to custodial interrogation has the right to have a lawyer present if he so requests, and to be advised of that right.”
 
 Mon-tejo, supra,
 
 129 S.Ct. at 2089. "Under
 
 Edwards'
 
 prophylactic protection of
 
 Miranda,
 
 once such a defendant 'has invoked his right to have counsel present,' interrogation must stop."
 
 Id.,
 
 129 S.Ct. at 2089-90. "And under
 
 Minnick’s
 
 prophylactic protection of the
 
 Edwards
 
 rule, no subsequent interrogation may take place until counsel is present, ‘whether or not the accused has consulted with his attorney.' "
 
 Id.
 

 [22]
 

 . The only situations covered by
 
 Jackson
 
 that are not covered by the
 
 Miranda-Edwards
 
 regime are those where a defendant is not in custody.
 
 Montejo, supra,
 
 129 S.Ct. at 2090.
 

 [23]
 

 . In remanding this matter, the Supreme Court directed our attention to
 
 Davis, supra
 
 at 459, 114 S.Ct. 2350 and Justice Kennedy's concurrence in
 
 Texas v. Cobb,
 
 532 U.S. 162, 176, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001) to determine whether Montejo's statements constituted a clear assertion of the right to counsel.
 
 Montejo, supra,
 
 129 S.Ct. at 2091. In
 
 Cobb,
 
 Justice Kennedy's concurrence questions the wisdom of
 
 Jackson
 
 and argues that it should only apply where the suspect has made a clear and unambiguous assertion of the right not to speak outside the presence of counsel, the same clear election required under
 
 Edwards. Cobb,
 
 532 U.S. at 176, 121 S.Ct. 1335 (Kennedy, concurring).
 

 [24]
 

 . The Court in
 
 Davis
 
 explained its reasons for requiring a clear and unambiguous request for an attorney as follows:
 

 The
 
 Edwards
 
 rule — questioning must cease if the suspect asks for a lawyer — provides a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information. But if we were to require questioning to cease if a suspect makes a statement that
 
 might
 
 be a request for an attorney, this clarity and ease of application would be lost. Police officers would be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong. We therefore hold that, after a knowing and voluntary waiver of the
 
 Miranda
 
 rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney.
 

 512 U.S. at 461, 114 S.Ct. 2350.
 

 [25]
 

 . In
 
 Moran,
 
 the Supreme Court found that police are not required "to supply a suspect with a flow of information to help him calibrate his self-interest, in deciding whether to speak or stand by his rights,” and therefore interrogators withholding of the information that his attorney was attempting to reach him was "only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.” Although the Sixth Amendment claim in
 
 Moran
 
 was resolved on the basis that "the events that led to the inculpatory statements preceded the formal initiation of adversary judicial proceedings,” the Court in its Fifth Amendment analysis declined to adopt a rule "requiring that the police inform a suspect of an attorney's efforts to reach him.”
 
 See Moran, supra,
 
 475 U.S. at 424, 432, 106 S.Ct. at 1143, 1146.
 

 [26]
 

 . According to
 
 Patterson,
 
 "because the Sixth Amendment’s protection of the attorney-client relationship — 'the right to rely on counsel as a "medium” between [the accused] and the State' extends beyond
 
 Miranda's
 
 protection of the Fifth Amendment right to counsel,
 
 see Maine v. Moulton,
 
 474 U.S., at 176, 106 S.Ct., at 487, there will be cases where a waiver which would be valid under
 
 Miranda
 
 will not suffice for Sixth Amendment purposes."
 
 Patterson, supra,
 
 487 U.S., at 297 n. 9, 108 S.Ct. at 2397. While after
 
 Montejo
 
 it is unclear whether a waiver valid for Fifth Amendment purposes will also be valid under the Sixth Amendment, existing Supreme Court precedent provided an independent ground for any constitutional argument that his waiver was invalid, especially in the Sixth Amendment context; therefore, he was required to assert it in a motion to suppress.
 

 [27]
 

 . In conjunction with his
 
 Jackson
 
 claim, defendant argued on original hearing to this Court in his reply brief that his waiver was not "knowing” because neither he nor the police knew he had been appointed an attorney. On original hearing, we held that the giving of
 
 Miranda
 
 warnings and the fact that lie had been told at the 72-hour hearing that counsel was being appointed to him was sufficient to apprise him of his right to counsel. 974 So.2d at 1262. In footnotes, we noted that "[e]ven if defendant's assertion is true and the police did tell defendant he did not have a lawyer, this does not rise to the level of the facts presented in
 
 Moran v. Burbine.” Id.,
 
 at 1262, n. 69. We also noted that Montejo did not claim his waiver was not voluntary.
 
 Id.,
 
 at 1262, n. 70. Thus, although the Supreme Court directed that Montejo can argue "the waiver was invalid because it was based on misrepresentation by police as to whether he had been appointed a lawyer,
 
 cf. Moran,”
 
 in reality he attempted to do so before
 
 Jackson
 
 was ever overruled.
 

 [28]
 

 . Jerry Moore was tried separately, convicted of second degree murder, and sentenced to life imprisonment. His conviction and sentence were affirmed on appeal and this Court denied writs.
 
 State v. Moore,
 
 06-1979 (La. App. 1 Cir. 3/28/07), 953 So.2d 209 (unpublished),
 
 writ denied,
 
 07-0851 (La. 11/9/07), 967 So.2d 500;
 
 see also State ex rel. Moore v. State,
 
 09-0177 (La. 10/16/09), 19 So.3d 475.
 

 [29]
 

 . Eric Gai pled guilty to manslaughter and received a 25-year sentence.