434 So.2d 399 (1983)
STATE of Louisiana
v.
Darryl BROWN.
No. 82-KA-1278.
Supreme Court of Louisiana.
June 27, 1983.
*400 William J. Guste, Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., John H. Craft, Clifford R. Strider, William R. Campbell, Jr., Asst. Dist. Attys., for plaintiff-appellee.
J.C. Lawrence, Jr., Dwight Doskey, Orleans Indigent Defender Program, New Orleans, for defendant-appellant.
BLANCHE, Justice.
Defendant, Darryl Brown, was indicted for second degree murder. After a trial by jury, he was found guilty of manslaughter. The trial court sentenced the defendant to serve twenty-one years in the custody of the Louisiana Department of Corrections. The defendant now appeals his conviction, asserting two assignments of error.
At approximately 11 a.m. on May 4, 1981, the body of Pamela Hill was discovered in her apartment in Algiers, Louisiana. The deceased was lying face up, submerged in her bathtub which was full of water. Her hands and feet were bound with gray commercial tape. Two potted plants were on top of her, holding her body below the surface of the water. Dr. Minyard, the coroner, estimated the time of death to be between 2 a.m. and 6 a.m. that same morning. The cause of death was listed in the autopsy protocol as probable drowning.
Pamela Hill's apartment revealed few signs of struggle. Several hair curlers were found on the floor and a chair was turned on its side. The doors and windows were secure. No money or jewelry was discovered missing from the apartment. Hill's body was bruised in several places, and her neck was scratched. Tests performed on the bodily fluids of the deceased showed that she had had sexual intercourse.
At trial, the state sought to establish that the defendant, Brown, who was Hill's fiance, was her assailant. Paul Holmes, an inmate in the Orleans Parish Prison, testified that the defendant confessed the crime to him while in jail. According to Holmes, Brown gave the following account of the killing: Brown had an argument with Hill over the weekend. On Monday, May 4th, Brown drove to Hill's apartment before work in order to reconcile with her. At Hill's apartment, the two entered into a heated argument. Hill threatened to call off the wedding. A struggle ensued during which Hill either fainted or was killed. Brown then bound and gagged Hill, placed her in the bathtub and turned on the water. Because Hill's body kept surfacing, Brown *401 placed potted plants on her to weigh her down.
Detective Marvin Cook of the New Orleans Police Department testified that the defendant gave him a statement on May 6, 1981. The defendant admitted in that statement that he had had an argument with Hill on the night before her death. He denied killing Hill, however. Cook further testified that he observed a cut on the defendant's hand on May 6th and asked the defendant how he received the injury. The defendant explained to Cook that on his way to work on May 4th, he heard a vibration in his car. He stopped his automobile to tighten the lug nuts on one of his wheels. When placing his jack in the trunk, he cut his hand on his hubcap.
Bloodstains were found on the bedspread, the sofa and the plant stand in the victim's apartment. Officer Charles Krone, a criminalist with the New Orleans Police Department and an expert in the field of the analysis of bodily fluids, testified that he analyzed the bloodstains in the apartment as well as blood samples taken from the defendant and Pamela Hill. Since both Brown and Hill were type O, Officer Krone performed a more complicated enzyme matching test on the bloodstains and samples. Through these enzyme tests, Officer Krone determined that the defendant's subgroup matched the bloodstains found in the apartment.[1] The victim's blood grouping did not match the stains.
A state's expert testified that he examined the defendant's hubcaps and found no trace of blood, skin or tissue on them.
An alibi defense was offered by the defendant. Brown took the stand on his own behalf and related the following account of his activities: On the evening of May 3, 1981, Brown spoke to Hill after church services. Following this conversation, he went to his mother's house where he resided. At his mother's house, he called Hill on the telephone, ate a piece of cake and then went to bed. The next morning, he awoke at 6:30 a.m. to prepare himself for work. He departed for work at approximately 6:45 a.m. En route to the office, he heard a vibration in his car, stopped to tighten the lug nuts on his wheel and sliced his hand on his hubcap. Brown rinsed off the blood on the hubcap with water from an anti-freeze bottle he kept in his car. He then drove to a sandwich shop and bought lunch. After he purchased his lunch, the defendant drove to work. Because his hand began to bother him, he left work and went home. Later that afternoon, he learned of Hill's death.
The defendant's mother and stepfather testified that they saw the defendant on the morning of May 4th as he readied himself for work. Both the mother and stepfather further stated that the defendant left home at approximately 6:45 a.m. During cross-examination, the stepfather admitted that the employees of the company for which the defendant formerly worked used gray commercial tape on the job.
On rebuttal, one officer testified that the defendant did not mention in his May 6th statement that he rinsed off his hubcap with water. The defendant's former supervisor testified that he noticed Brown at work at approximately 7:15 a.m. on May 4th. He further stated that Brown informed him at that time that he had injured his hand while changing a flat tire.
The jury, obviously disbelieving the alibi defense, returned a manslaughter verdict.

ASSIGNMENT OF ERROR NUMBER 1
Defendant contends that the trial court erred in denying his motion to suppress the confession he allegedly made to Paul Holmes.
At the hearing on the motion to suppress, the prosecution called the investigator in charge of the Pamela Hill murder case, Detective Marvin Cook, to testify. Cook stated that he was contacted on June 24, 1981 by an employee of the sheriff's office. He stated that he was informed by the sheriff's employee that a prisoner named Paul Holmes had information concerning Darryl Brown's involvement in the Hill murder. Cook testified that this was the *402 first time that he was aware that Holmes was in jail. He further testified that, to his knowledge, no one in the police department or in the district attorney's office had arranged the meeting of Holmes and the defendant. Cook denied that Holmes was a paid informant or that any promises were made to Holmes before his statement. According to Cook, he initially spoke with Holmes on June 24th, and the following day, he and an assistant district attorney interviewed Holmes.
Paul Holmes testified at the hearing that the police never contacted him before he spoke with Brown. He further stated that no one paid him to talk to Brown nor were any promises made to him before his conversation with Brown. Holmes testified that he voluntarily furnished the information to the police in order to help himself. According to Holmes, this was the first time he had ever supplied information to the district attorney in any case.
The defense argues that the incriminating statements were elicited from the defendant in derogation of his Sixth Amendment right to counsel. In brief, the defense relies heavily on United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).
We find the defendant's contention to be without merit. The defendant's reliance on United States v. Henry, supra, is misplaced. In Henry, the defendant made incriminating statements to a fellow prisoner who was acting under instructions as a paid informant for the Government. The United States Supreme Court suppressed the statements, declaring:
"By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." 447 U.S. at 274, 100 S.Ct. at 2189.
In our present case, the record clearly shows that Holmes was not a paid government informant. The state did not create a situation which was likely to induce the defendant to make incriminating statements. Hence, the defendant's right to counsel was not violated. See United States v. Van Scoy, 654 F.2d 257 (3rd Cir. 1981).
Alternatively, the defendant argues that the trial court erred in denying his motion to suppress, for the state did not give the defense notice of intent to use the inculpatory statements allegedly made to Paul Holmes, as required by La.C.Cr.P. art. 768. We find that the defendant is not entitled to relief on this issue because he did not raise this objection at trial. It is well-settled that a new basis for an objection cannot be raised for the first time on appeal. La.C.Cr.P. art. 841; State v. Sims, 426 So.2d 148 (La.1983); State v. Johnson, 389 So.2d 372 (La.1980). In any event, the record reflects that, six days before trial, the state did file, in compliance with Article 768, written notice of its intention to use the confession related by the defendant to Paul Holmes.

ASSIGNMENT OF ERROR NUMBER 2
By this assignment, the defendant argues that the trial court erred in refusing to permit an alibi witness to testify.
Several months prior to trial, the state filed a notice of alibi which requested the names and addresses of defense witnesses who would testify concerning the defendant's activities between the hours of 5 a.m. and 11 a.m. on May 4, 1981. The defense filed its response and listed Oscar Martin and Louise Brown Martin as alibi witnesses. On the third day of trial, however, the defense attempted to call another alibi witness, Marina Perkins, to testify. Marina Perkins was employed by the sandwich shop from which the defendant allegedly purchased lunch before work on May 4th. The state objected to Perkins' testimony on the basis that the alibi notice filed by the defense did not include Perkins' name as a witness. The trial court held an evidentiary hearing outside the presence of the jury to determine whether Perkins should be permitted to testify. At the conclusion of the hearing, the trial court decided to exclude the testimony of Perkins.
*403 Section A of La.C.Cr.P. art. 727 provides that upon proper written demand by the district attorney, the defendant shall serve upon the district attorney written notice of his intention to offer an alibi defense. The notice is to include the names and addresses of the witnesses upon whom the defendant intends to rely to establish his alibi. If the defendant fails to comply with the notice requirement, Article 727(D) states that the trial court may exclude the testimony of any undisclosed alibi witness. For good cause shown, however, the trial court has the discretion to grant an exception to the notice requirements. La.C.Cr.P. art. 727(E).
The defendant concedes that he has failed to serve the district attorney with written notice of his intention to use Perkins as an alibi witness. He contends, however, that good cause was established during the hearing, and the trial court abused its discretion in refusing to allow Perkins to testify. Defense counsel states that he did not become aware of the existence of Marina Perkins until the second day of trial. At that time, he orally informed the district attorney of Perkins' identity. Furthermore, defense counsel states that Perkins was brought to court by the sheriff on the second day of trial on an instanter subpoena. He argues that the state had the opportunity to question Perkins at this time.
This Court, following the decision of United States v. Myers, 550 F.2d 1036 (5th Cir.1977), has enumerated several factors to consider in determining whether the trial court properly exercised its discretionary power to exclude undisclosed alibi evidence. These factors are:
"[A] district court could consider (1) the amount of prejudice that resulted from the failure to disclose, (2) the reason for nondisclosure, (3) the extent to which the harm caused by nondisclosure was mitigated by subsequent events, (4) the weight of the properly admitted evidence supporting the defendant's guilt, and (5) other relevant factors rising out of the circumstances of the case." 550 F.2d at 1043; State v. Brown, 414 So.2d 689 (La. 1982). State v. Bias, 393 So.2d 677 (La. 1981).
Reviewing the ruling of the trial court in light of these factors, we are unable to say that the court abused its discretion in excluding the testimony of Perkins. As noted by the trial court, the state was prejudiced by the defendant's failure to disclose. The prosecution had delivered its opening statement and had called several witnesses before it was apprised of the existence of Perkins. In addition, although defense counsel was not aware of Perkins until the second day of trial, both the defendant and his stepfather knew Perkins. The defendant's stepfather had spoken to Perkins three or four months prior to trial. She informed him during their conversation that she remembered the defendant because she saw him every morning in the sandwich shop. Even though the defendant and his stepfather were frequently in touch with defense counsel, they did not furnish him with the name of Marina Perkins. Finally, the testimony of Perkins was not crucial. The state did not seek to disprove the fact that the defendant purchased his lunch at the sandwich shop before work on May 4th. Under the state's theory of the case, the defendant could have murdered Hill prior to his visit to the sandwich shop.

DECREE
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Officer Krone testified that five to six percent of the population has this specific bloodtype.