EDWIN A. LOMBARD, Judge.
_JjThe defendant, David Marx, appeals his conviction for the second degree murder of his wife, Mary Marx. After review of the record in light of the applicable law and arguments of the parties, we affirm the defendant’s conviction and sentence.

Relevant Facts and Procedural History

Mrs. Marx was murdered on May 25, 2011, with two arrows fired from a cross-' bow. On October 20, 2011, the defendant was charged by indictment with two counts: (1) second degree murder in violation of La.Rev.Stat. 14:30.1 and (2) obstruction of justice in the second degree murder charged in Count l.[1] He pleaded *47 not guilty to both charges at his arraignment on November 2, 2011, and, on the morning of trial (December 2, 2013), the trial court granted the State’s motion to sever the offenses. On December 6, 2013, the defendant was found guilty by a twelve-person jury of second degree murder. On December 10, 2013, the defendant filed a combined motion for a new trial and for reconsideration of the trial court ruling on the defendant’s motion to suppress his statement. On that date, the defendant also waived legal delays and the trial court sentenced him to 12life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence
The defendant timely appeals his conviction, arguing trial court errors and insufficiency of the evidence.

Error Patent Review

A review of the record reveals no errors patent on the face of the record.

Sufficiency of the evidence

Appellate counsel challenges the sufficiency of the evidence, arguing that if the defendant’s statement (confessing to the murder) were suppressed, the remaining evidence is insufficient to support his conviction. This issue is raised as the fourth and final assignment of error in appellate counsel’s brief; the first three assignments of error pertain to purported trial errors related to the suppression of the statement. However, when sufficiency of the evidence is raised as an issue, the court always reviews the entirety of the record before considering other assignments of error to determine whether, in accordance with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), viewing all the evidence as a whole, in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Id. (emphasis added). Thus, our review necessarily includes the defendant’s statement because “[i]t is well-settled that the entirety of the evidence, whether properly or- improperly admitted, is to be considered by the reviewing court when assessing a conviction for sufficiency of the evidence.” State v. Duncan, 2011-0563, p. 10 (La.App. 4 Cir. 5/2/12), 91 So.3d 504, 512 (citing State v. Hearold, 603 So.2d 731, 734 (La.1992)); see also Lockhart v. Nelson, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988) (if reviewing court determines there has been trial error (which was not harmless) in cases in which the entirety of the |sevidence was sufficient to support the conviction, then the accused must receive a new trial, but is not entitled to an acquittal even though the admissible evidence, considered alone, was insufficient).
The following relevant evidence was adduced at trial. Pertinent to our review is whether the State made the required showing under La.Rev.Stat. 14:30.1 that the offender had a “specific intent to kill or inflict great bodily harm.” La.Rev.Stat. 14.30.1.
In May 2011, the defendant was a Chief Petty Officer in the U.S; Navy, stationed in Norfolk, Virginia, but his wife and son lived at the Marx residence, 717 Nunez Street, in the Algiers Point neighborhood of New Orleans. The next door neighbor, Tina Brown, testified that they had been neighbors for four years and she frequently saw Mrs. Marx taking her son, Ian, to and from school. On the evening of May 25, 2011, when Ms.- Brown returned home from work about 5:30 p.m., she was approached by a military police officer who requested that she pick Ian up from his school on the grounds of the U.S. Navy base. Accordingly, Ms. Brown followed the officer to the' school and returned home with the child. Ian walked around the side of the residence toward the back *48 and started screaming hysterically; Ms. Brown called 911. She was unsuccessful in her attempt to reach the defendant by telephone that evening, but spoke to him the next day. According to Ms. Brown, the defendant explained “he had just gotten his cell phone back or he had trouble with his phone” and had noticed a lot of messages. He also indicated that he had spoken to Detective Barrett Morton of the New Orleans Police Department (NOPD) and was aware of his wife’s death.
Special Agent Leonard Blue of the Naval Criminal Investigative. Service (NCIS) testified that he was notified of the homicide because the victim was the |4wife of a member of the U.S. Navy. Accordingly, on the evening of May 25, 2011, Agent Blue went to the crime scene and spoke with Detective Morton. He ascertained that the defendant was stationed in Norfolk, Virginia, but on leave until the end of May. Agent Blue identified State Exhibit 4, the military leave request authorization, pointing out that the defendant requested the leave on May 13, 2011, with a return date of May 27, 2011. According to Agent Blue, the defendant was not located or contacted by phone on the night of the murder because his cell “phones” were turned off.
Agent Blue testified that his role in the investigation was to coordinate the military and NOPD. As such, NCIS agents in Norfolk began a visual surveillance of the defendant, NCIS agents in Dallas, Texas, interviewed Mrs. Marx’s mother, and NCIS agents in Pensacola, Florida (listed on the defendant’s original leave authorization request) retrieved a receipt from the Red Roof Inn in Pensacola (State Exhibit 6) that showed when the defendant checked in and checked out. According to Agent Blue, NCIS closed its case when the defendant retired from the military in November 2012. On cross-examination, Agent Blue confirmed that the defendant’s cell phone records did not indicate that he was anywhere in .the vicinity of the crime scene.
Terry Barrett, a New Orleans Rapid Transit Authority (RTA) bus driver and resident of Algiers Point since 1989, testified that at about 7:00 a.m. on May 24, 2011, he was trimming a tree in front of his residence on Slidell Street and, because he and his neighbors “looked out for each other,” he paid attention when he saw a male parking a white Ford Escape on the corner of Slidell and Teche Streets. According to Mr. Barrett, the vehicle was facing in his direction and he could see a white male inside. The next morning, Wednesday, May 25, 2011, he ] ^noticed the same vehicle parked at the same corner. Mr. Barrett left to get a newspaper and, upon his return, saw the same individual from the previous day walk from around the corner of Nunez Street to the vehicle, enter it, and drive off. Mr. Barrett testified that he thought the vehicle had a Texas license plate and that he had never seen the individual in the neighborhood before.
Later that night (Wednesday, May 25, 2011), Mr. Barrett observed a crowd on Nunez Street and learned about the murder. The next evening, Thursday, he spoke with his neighbor, Arthur Sanga-cruze,. about the strange man they had both observed in the neighborhood and then walked with Mr. Sangacruze around the corner to speak to a police officer at the murder scene. On Friday (May 27, 2011), Mr. Barrett went to police headquarters and, upon being shown a photo lineup (State Exhibit 8), identified the photograph of the person he had seen in his neighborhood on Tuesday and Wednesday. When asked at trial (in December 2013) if he thought he could recognize the person he had seen in the white Ford Escape (in *49 May 2011), Mr. Barrett replied that he should be able to, but that he had not seen the individual before or since that time. Mr. Barrett confirmed that the person he observed in 2011 had a moustache. He did not identify anyone in court.
Mr. Sangacruze, a concrete construction worker and resident of Slidell Street in 2011, testified that while sitting on his porch on the morning of May 25, 2011, he saw an unfamiliar white male. He explained that there were only two white couples living on the block and everybody in the neighborhood knew each other. According to Mr. Sangacruze, the man walked to what he remembered as a white SUV parked on Slidell Street between Nunez and Teche Streets, entered it, and drove off. Mr. Sangacruze learned of the murder later that day and the following day, after talking to Mr. Barrett, went with Mr. Barrett to talk to police at the | fiinurder scene. He identified the photo lineup (State Exhibit 9) where, on May 27, 2011, he identified the defendant in photo number three and signed the back of it. Mr. Sangacruze was not asked whether he could identify anyone in court. He conceded that he had described the white stranger to police as having a moustache and confirmed that the person he saw did not have a “military” haircut. According to Mr. Sangacruze, the individual left in the vehicle at approximately 9:00 a.m. on the day of the murder, but he could not recall whether the man was carrying anything while walking toward the SUV.
NCIS Investigator Bruce J. Dutcher, of the Norfolk, Virginia, NCIS office, identified photographs he had taken during the search of the defendant’s apartment and of a white 2008 Ford Escape, bearing Texas license plates. The searches were conducted pursuant to a “Permissive Authorization for Search and Seizure” (PASS). One photograph depicted a box for a crossbow scope that, according to Investigator Dutcher, was discovered underneath the front passenger seat of the white Ford Escape. In addition, two cell phones were recovered from the vehicle.
NCIS Special Agent Michael Folker (also of the Norfolk, Virginia, NCIS office) testified that he was assigned to aid the NOPD in its investigation and, accordingly, conducted initial surveillance and coordinated with the Virginia Beach Police Department SWAT team in detaining the defendant outside his apartment in Virginia Beach. After the defendant was detained and handcuffed, Agent Folker obtained the “PASS” (State Exhibit 10) which was signed by the defendant and Michele Conry, who resided in the apartment with the defendant, authorizing the search of the defendant’s vehicle and apartment.[2] The defendant 17was transported to the Virginia Beach Police Department and interviewed by Agent Folker. A DVD of the interview (State Exhibit 21) was played for the jury and Agent Folker identified the defendant’s handwritten statement (State Exhibit 21), as well as the “Military Subject’s Ac-knowledgement and Waiver of Rights” (State Exhibit 24), which the defendant initials and signs in the video.
Agent Folker testified that he also interviewed Ms. Conry. He conceded that he talked to the defendant when he was arrested but denied conducting a pre-inter-view with defendant or talking to him 'off camera. Agent Folker stated that the defendant was extremely cooperative and freely signed the authorization to search *50 form. He admitted that he tried to make the defendant feel comfortable in an effort to get the defendant to confess to the crime. He also conceded that he identified the defendant’s son as his “soft spot” and used his wife’s abuse of their son as a “theme” in the interview.
Detective Morton, the lead NOPD homicide investigator in the murder, testified that he received notification of Mrs. Marx’s death at 6:00 p.m. on May 25, 2011. When he arrived at the scene, he saw no signs that the shot-gun residence had been burglarized; rather, a camcorder and other electronic devices, including a “tablet notebook,” a television, and a newer MAC computer appeared undisturbed and, although the victim’s purse was open, her checkbook' and wallet remained at the scene. Likewise, Detective Morton observed no signs of a forced entry (the front door had been forced open by a neighbor only after the victim’s son saw his mother’s body on the floor through a window). The victim was positioned such that her legs were in the kitchen and the rest of her body was in a bedroom. Detective Morton identified a diagram of the residence and photographs of the crime scene, including one showing the victim’s purse on her shoulders.
| ^Detective Morton testified that he called and left a voice message for the defendant who did not return his call until 7:00 p.m. the next day. When Detective Morton informed him that his wife had been killed in New Orleans, the- defendant asked no questions concerning his wife’s death, stating only that he was making arrangements to come to New Orleans to get his son.
Detective Morton confirmed that Mr. Barrett and Mr. Sangacruze approached a patrolman at the scene the day after the murder and that a Detective Bender interviewed them, recording their -statements about a stranger in a white SUV that had been parked in the neighborhood on May 24-25, 2011. Detective Morton testified that after both men identified the defendant in separate six-person photo lineups (compiled by the Louisiana State Police) on May 27, 2011, he applied for and obtained an arrest war'rant for defendant.
On May 28, 2011, after the defendant’s arrest, Detective Morton traveled to Virginia Beach and obtained a recorded statement after advising him of his rights and obtaining his waiver on a NOPD waiver of rights form. Detective Morton identified State Exhibits 55 as the waiver of rights ■ form and State Exhibits 56 and 57, respectively, as the recording of defendant’s statement given to him and á transcript of that statement. According to Detective Morton, the defendant’s initial concern was his son — where he was and where he would end up. Detective Morton found the defendant to be very forthcoming and the discussion about his son “escalated” into the defendant telling him what had happened. Detective Morton testified that “when I asked him if he hurt her, he said, yes.” At that point, Detective Morton advised the defendant of his rights before taking a formal statement. Detective Morton explained that if someone engages him in a conversation and they are not talking directly about the incident, he will talk to |9them, but that “[i]f the conversation leads into the incident, and they’re about to get into the particulars of it, I’ll stop and advise them of their rights, make them understand that I want to document what they’re about to say. I’ll advise them of their rights, so they understand that they don’t have to talk to me, that what they say could be used against them.”
Detective Morton testified that he did not begin recording the defendant’s statement until after the defendant was advised of and waived his rights. He conceded *51 that he talked to the defendant for approximately an hour before taking the recorded statement and that he believed the defendant’s tale of desperation involving his son and his marriage. Specifically, the defendant told Detective Morton that the victim administered prescribed medications to their son (for attention deficit hyperactivity disorder and/or Asperger’s), a treatment he opposed, and that she had struck their son. In Detective Morton’s opinion based on the evidence at the scene, the defendant appeared to be telling.the truth insofar as the details of his admitted commission of the murder. On redirect, Detective Morton affirmed that he was aware that the defendant had been advised of his rights the previous night when arrested by Virginia Beach police and NCIS agents. Detective Morton also denied promising the defendant anything in exchange for his statement.
NCIS Agent Brian Bozin testified that he was stationed at the Norfolk, Virginia, NCIS office in 2011 and assisted Agent Folker with the defendant’s arrest, as well as with the search of the defendant’s vehicle and apartment. Agent Bozin met Detective Morton at the Norfolk airport the day after the defendant’s arrest and drove him to the Virginia Beach jail where the defendant was incarcerated. The defendant told Agent Bozin that he did not want to talk to him |in(Agent Bozin) when he entered the interview room with Detective Morton and, accordingly, Agent Bozin left the room. He stood outside listening to the conversation, but heard only “bits and pieces,” including the defendant being advised of his Miranda[3] rights.
Agent Bozin confirmed that he had been present the previous night during Agent Folker’s interview with the defendant and that the defendant had been extremely concerned about his son. Agent Bozin conceded that the night of his arrest, the defendant “repeatedly denied committing this offense.” Agent Bozin testified that he “believed” he heard Detective Morton tell defendant he would let him either see or telephone his son, “It was either see or call. I know that he did mention some kind of contact with his son.” Agent Bozin could not recall whether this occurred before or after Detective Morton turned on the recorder and took the formal statement.
Ms. Conry testified that she met the defendant in February 2010, had a personal relationship with him, and lived with him in Virginia. In 2011, they traveled to Pensacola, Florida, for rest and relaxation, leaving on a Sunday and returning on Thursday. She said the defendant left several times at night, but that during the day they were together. Ms. Conry testified that he was with her during the day on Tuesday but left at about 1:00 a.m. on Wednesday, May 25, 2011. Ms. Conry stated that when she woke up at approximately 9:00 a.m., she purchased a takeout breakfast from a restaurant across' the street from the hotel and returned to the room to eat it. She estimated that the defendant returned to the Pensacola hotel room at around 11:30 or 11:40 a.m. and she did not ask where he had gone. They began driving back to Virginia after 5:00 p.m. on Thursday and arrived home about |n7:30 p.m. the following day. She did not remember the defendant receiving any phone calls in the car on the trip back to Virginia, although at some point during the return trip the defendant told her that something had happened and he might need to go to New Orleans. Once back at the defendant’s apartment in Virginia, the defendant said he was going down to his vehicle and she fell asleep, only to be *52 awakened by the police. They took her downstairs, put her in a vehicle, and transported her to a police station, where she gave a statement. On cross-examination by defense counsel, Ms. Conry identified photographs she and the defendant had taken at the Pensacola Naval Museum on May 24, 2011, confirming that he did not have a moustache or long hair in the photos. She replied in the affirmative when asked whether defendant had a military, haircut the entire time she had known him.
Carlos Kronberger, a clinical psychologist, confirmed that he had treated the defendant’s son for Asperger’s and ADHD since September 2010 and that the youth was receiving medication for ADHD and a small dose of antidepressant. Doctor Kronberger testified that he had never observed any signs that the child was being abused.
Richard Blanchard, custodian of records, at the Virginia Beach Sheriffs Department for recordings of inmate telephone calls, identified CD’s of telephone calls made by defendant from the Virginia Beach jail (State Exhibits 58-59) from June 3, 2011 to August 2, 2011. The State played “select phone calls” from the recording for the jury. .
Daniel Davis testified that he was a mechanical engineer. He worked for Barnett Outdoors, a company that designed,, manufactured, and distributed cross bows, including a model C5 Wildcat crossbow. He said that model crossbow is 112shipped by the company with an owner’s manual and accessories, including a scope that he said must be installed by the purchaser/end user. Mr. Davis identified State Exhibit 60 as a Barnett C5 Wildcat crossbow. He stated that the Barnett C5 Wildcat is usually shipped with three field point arrows for target practice. The witness also identified a three-bladed broadhead arrow point - (State Exhibit 61) as one “used for killing,” noting that his company did not ship that particular type of broad-head. Finally, Mr. Davis identified a C5 Wildcat owner’s manual and a box for the scope (State Exhibit 13) that went with the crossbow, observing that when it was fired, the crossbow is “fairly quiet.”
Michael Defatta, M.D., identified the report for the autopsy performed on Mary Marx on May 26, 2011 (State Exhibit 62). He testified that he initially noticed that there were two cylindrical rods protruding from the victim’s body, each with broken edges. One was protruding from the left side of the victim’s nose, the other from her right chest. The autopsy revealed that the rods were shafts of two arrows. The arrow through the victim’s nose pierced her skull, and during the exterior scalp examination of that wound, the arrow tip (which had previously broken off) fell from the victim’s long hair. Doctor Defat-ta testified that he had performed approximately six thousand autopsies, but had never before encountered arrowheads. He also identified photographs (State Exhibits 65-67) taken during the autopsy.
According to Doctor Defatta, the arrow through the victim’s nose pierced the right side of her brain and exited the back left side of her skull. The second arrow passed through the second and third ribs and the upper lobe of the right lung before severing the spinal cord and lodging in her vertebra. The victim also had a three-inch laceration to the back of her head that could have been caused by a blow |1sor from her falling back and hitting her head. He said the victim would have been paralyzed from the chest down as a result of her spinal cord being severed, and she would have collapsed. He said the trauma to the brain caused by the arrow that pierced her nose also would have caused her to collapse. Either injury would have been fatal. The manner of death was clas *53 sified as a homicide. Doctor Defatta also identified a photo (State Exhibit 69) of two arrows, one in three pieces, the other in two pieces, and envelopes (State Exhibits 70 and 71) containing those respective arrow pieces. He said the victim’s bodily fluids tested negative for drugs and alcohol.
The defendant testified that he was forty-six years old, had been born in Stewart, British Columbia, and grew up in Hyder, Alaska. He joined the U.S. Navy after high school and was first stationed in Norfolk Virginia (where he met and married the victim) from June 1986 until November 1989. He separated from the service but later reenlisted in the Navy Reserve, where he stayed until he separated from the service in October 2012. His son was born in New Orleans in November 1998, and he and his wife purchased their home there in August 2007. His wife and son traveled with the defendant to different postings but sometimes remained in their New Orleans home during deployments. The defendant testified that he had not seen his son since December 2010, although they spoke on the phone up until his wife’s death on May 25, 2011. When questioned why he had travelled to Florida in May 2011 but had failed to visit his son, the defendant explained that he had planned to retire on May 31, 2011, and to see his son afterwards.
The defendant stated that he had been concerned about some of the medications that were being prescribed for his son by Doctor Kronberger and |,4another doctor. He believed that his son’s sessions with Doctor Kronberger should have been decreased and that his son should have been involved in after school programs and summer youth programs to help him find new friends. The defendant denied ever having a moustache. The defendant explained that he gave his statement to the NCIS agents the day after learning of his wife’s death when he was very intimidated, shocked, and dismayed because he had been married to his wife for twenty-three years and had loved her. According to the defendant, he had been coerced and intimidated by. the NCIS agents and signed all the documents as requested because he had nothing to hide. The defendant claimed that he did not know how the crossbow scope box or the “handwritten list” (apparently referring to a list of crossbows and prices, State Exhibit 19) had gotten into his car. Moreover, he denied ever purchasing, owning, or shooting a crossbow. When asked why he told NCIS agents that he drove to New Orleans from Pensacola, the defendant said that he told the agents what they wanted to hear and that they coerced him into making a statement. . ,
With regard to the statement given to Detective Morton, the defendant claimed he “had mentioned that [he] wished to speak with a lawyer” before he was brought into the inteiwiew room and that Detective Morton talked with him before turning on the recorder. According to the defendant, when NCIS arrested him he realized that he was not going to see his son again and feared for his son’s life. The defendant also claimed he was terrified, noting that he had never been in jail before. The defendant claimed that before recording the interview, Detective Morton promised him he would get his son back, that custody would be given to his parents in Alaska, and that visits with his son would be arranged. When questioned as to the details he gave to Detective Morton, defendant claimed that [ ^Detective Morton told him his wife had been shot with two “bolts” from a crossbow and that they found her lying by his son’s bedroom. When asked whether he killed his wife, the defendant replied: “No.”
*54 On cross-examination, the prosecutor asked the defendant what Detective Morton did, in light of the defendant’s Navy training, to intimidate the defendant into confessing to the murder of his wife with such heinous and horrible details. The defendant asserted that Detective Morton had talked about all the details and then told him that he could get his son back if he gave a statement. When asked about his retirement plans at the time of his wife’s death, the defendant conceded that his wife would have received fifty percent of his pension benefit upon his retirement. The defendant claimed that he loved his wife very much and could not live without her but conceded that it was his voice on the recording of a jail telephone call (State Exhibit 59) referring to his late wife as a “bitch.”
The defendant’s recorded statement given to Detective Morton was played for the jury. In it, the defendant talked about the victim’s alleged physical and emotional abuse of their son and her neglect of him, with regard-to feeding him and keeping house. He also disagreed with her giving their son amphetamines and anti-depressants. He said his wife once struck their son for getting a bad report card. The defendant claimed that the victim was frustrated with dealing with their son’s temperament and had told him on at least one occasion that she did not care whether he (the son) lived or died. He said she had once pointed out homeless people under a bridge and told their son that was going to be him; that he was going to be homeless. The defendant said that scared his son. He said his wife felt negatively toward him and took it out on their son. He said she would tell their son that the defendant did not love him and was never coming home.
hJn the recorded statement, Detective Morton questioned the defendant about the day his wife was killed, asking him to start from when he got to New Orleans. The defendant said that it was still dark when he parked on a side street, grabbed his crossbow, proceeded to the residence, and crawled underneath it. He watched the victim leave to bring their son to school and then entered the residence through the back door with the crossbow in a bag. When he observed the condition of the house and checked on the medication his wife was giving their son, he became enraged. His wife returned home and he shot her with an arrow in her upper right shoulder and, because she was still moving after she fell, he shot her in the head with a second arrow. After shooting his wife, the defendant left through the back door, walked to the front of the residence, and back to his vehicle. He drove back to Florida, breaking up the crossbow and discarding it in more than one dumpster. He said he was so mad he did not care anymore because someone had to save his son. The defendant said he purchased the crossbow from a private person in Richmond, after doing some searches for them, but only with the intention of “target practice.” He admitted, however, that when he was headed to Florida he was thinking about going to New Orleans and “finishin’ her off.” He said he did not bring his cell phone to New Orleans and that “I jus’ wanted to go do what I had to do.”

Analysis

As previously observed, in asserting that the evidence is insufficient to sustain the defendant’s conviction if the defendant’s recorded confession to Detective Morton is excluded, it is clear that appellate counsel misapprehends Jackson v. Virginia which mandates reviewing all the evidence. See Lockhart v. Nelson, supra; Hearold, supra; Duncan, supra. After viewing the all of the 117evidence in this case, including *55 the defendant’s statement, in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the defendant killed his wife while having the' specific intent to kill or inflict great bodily harm upon her. The defendant was identified in two photo lineups by witnesses several days after the murder as the man they saw in the neighborhood the evening before and morning of the murder, a crossbow scope box was recovered from the trunk of the defendant’s vehicle, and Ms. Conry acknowledged that the defendant left the hotel in Pensacola during the night before the murder and had not returned until almost noon on the morning of the murder. Based on this evidence, viewed in the light most favorable to the prosecution, a rational trier of fact could have found that the defendant killed his wife with the necessary specific intent. Therefore, there is no merit in the defendant’s argument that there evidence is insufficient evidence to support his conviction.

Counsel’s Assignments of Error 1-3

The three trial errors argued by appellate counsel all relate to the voluntariness of the defendant’s statement given to Detective Morton in which the defendant admitted to having killed his wife three days earlier. Appellate counsel argues that the trial court erred in denying: (1) the defendant’s motion to reopen the motion to suppress the statement; (2) the defendant’s motion for a new trial; and (3) the defendant’s motion to suppress the statement. The crux of appellate counsel’s argument is that the defendant’s confession to Detective Morton was involuntary and, therefore, inadmissible because it was given as a result of inducements or promises by the detective. In support, appellate counsel points to the trial testimony of the defendant and Agent Bozin. In his testimony, the defendant claimed that Detective Morton “promised” him that he would arrange 118for visits with his son and for the defendant’s parents, to have custody of the boy. Agent Bozin stated that he overheard Detective Morton mention “some kind of contact” between the defendant and his son. As a result, appellate counsel argues that the trial erred in not suppressing the statement, “reopening” the issue after the verdict, or granting a new trial.
A review of the record reveals, however, one overriding difficulty with appellate counsel’s argument. As the State correctly points out, there is nothing in the record to indicate that trial counsel ever “made or filed” a motion to suppress the defendant’s statement at any point prior to or at trial. Specifically, the record contains no written motion to suppress, nor does any minute or docket master entry reflect the making or filing of any pretrial motion to suppress, oral or written. The earliest mention of motions is contained in minute and docket master entries from November 21, 2011, reflecting that a hearing on motions was set for March 16, 2012. This hearing was continued numerous times, ultimately being held on September 13, 2012, as minute and docket master entries from that date reflect that motions to suppress the evidence, statement, and identification were heard. Moreover, although “motions” were routinely set for hearing, there is nothing in the record to suggest that the defendant ever asserted at any time, in any manner, a ground for suppressing defendant’s statement/confession given to Detective Morton. In addition, there is nothing in the record to indicate that trial counsel objected to the admissibility of the statement either because the statement was not freely and voluntarily given or because it was induced by Detective Morton’s promises of letting the defendant have contact with his son. Thus, to the extent that appellate counsel asserts that the.trial court erred in deny *56 ing the defendant’s motion to suppress, we cannot consider this argument because it was never Improperly before the trial court. Concomitantly, because no motion was filed or made to suppress the statement, there can be no error in the trial court’s denial of the combined post-trial motion entitled, “Motion to Reconsider the Court’s Ruling on the. Motion to Suppress Defendant’s Statement to Detective Morton, Grant the Motion to Suppress and Grant a New Trial” filed by trial counsel at the sentencing hearing on December 10, 2013.
Moreover, even accepting arguen-do, that a written or oral motion to suppress was unnecessary and that the entries in the docket minutes constitute a properly filed motion to suppress, the transcript of the hearing does not show that the trial court erred in its ruling at the motion hearing on September 13, 2012. Specifically, the defendant did not testify at the hearing and no questions were asked of Agent Bozin as to what he “may have overheard” when NOPD Detective Morton questioned the defendant. Agent Bozin was only questioned (by both the State and defense counsel) as to the defendant’s statement taken by NCIS on the day he was taken into custody in Virginia Beach on May 27, 2011, several days after defendant’s wife was killed. Agent Bozin made no reference to the defendant’s son in his hearing testimony. Likewise, Detective Morton’s testimony at the motion hearing relates only to whether the defendant was advised of, understood, and waived his rights before making the statement and whether Detective Morton forced, threatened, or coerced the defendant into signing the rights-of-arrestee form or into giving him the statement. Trial counsel’s cross examination of Detective Morton at the hearing consisted of only five brief questions: (1) where he interviewed defendant; (2) whether it was the only interview he conducted of defendant; (3) whether it was recorded; (4) when it took place; and (5) whether the “3:30, 4:00” time of the interview was in the “P.M.” lznMost notably, trial counsel asked no questions of Detective Morton concerning the defendant’s son.
The absence of a motion to suppress and, concomitantly, the lack of opportunity for the trial court to rule on such a motion, necessarily precludes this court from considering on appeal whether the defendant’s confessipn was inadmissible at trial. See State v. Brown, 434 So.2d 399 (La.l983)(a defendant may not raise new grounds for suppressing evidence on appeal that he did not raise at the trial court in a motion to suppress); see also State v. Montejo, 2006-1807, pp. 21-26 (La.5/11/10), 40 So.3d 952, 967-970 (a defendant must object to the admission of a confession by the filing of a motion asserting the constitutional grounds under which the confession must be suppressed, as well as the facts entitling him to relief, within the time limitations set by the trial judge).
In this case, at the time of the motion hearing there was no evidence before the trial court relating to Detective Morton’s so-called inducements or promises to the defendant as, notably, it was not until trial that defense counsel elicited from the defendant and Agent Bozin the pertinent testimony upon which the argument is based. See Montejo, 2006-1807, pp. 25-26, 40 So.3d 969-970 (when grounds are not asserted in a motion to suppress prior to trial, a defendant is not allowed to “allege facts for the first time in trial testimony which would support a new argument for suppression of evidence and have a reviewing court consider those facts in determining whether the district court should have granted a motion to suppress on grounds that were never argued to, or considered *57 by, the district court”). Therefore, even if the admissibility of the defendant’s statement were properly before this court, we are prohibited from considering the trial testimony of |2iAgent Bozin or the defendant himself regarding alleged promises or inducements made by Detective Morton relative to the defendant’s son.
Moreover, with regard to appellate counsel’s assertion that the trial court erred in denying the defendant’s post-trial motion to reopen/reconsider its September IB, 2011, ruling at the motion hearing, the Louisiana Code of Criminal Procedure does not provide a procedural mechanism authorizing a trial court to “reconsider” a pretrial ruling on a motion to suppress after a verdict has been rendered. Thus, even had a motion to suppress been filed on behalf of the defendant prior to or during trial, the trial court was without authority to reconsider a ruling on a motion to suppress after the verdict.
With regard to the denial of the motion for new trial filed on behalf of the defendant by trial counsel, La.Code Crim. Proc. Art. 851 provides five specific grounds: (1) the verdict is contrary to the law and evidence; (2) the court’s ruling on a written motion or an objection made during the proceedings shows prejudicial error; (3) new and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during trial; (4) the discovery since the verdict of a prejudicial error or defect in the proceedings; and (5) the court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
The defendant’s post-trial December 10, 2013, combined “Motion To Reconsider The Court’s Ruling On The Motion To Suppress Defendant’s Statement To Detective Morton, Grant The Motion To Suppress And Grant A New Trial” states, in its entirety:
JjgNOW INTO COURT, through undersigned counsel, comes Defendant, David Marx, who hereby moves the Court to reconsider its ruling on the defendant’s motion to suppress his statement made to Detective Morton and grant him a new trial for the following reasons.
Prior to trial the Court ruled that the statement given by Mr. Marx to Det. Morton was admissible. During trial, however, facts emerged that indicated Mr. Marx’s statement was not free and voluntary as the statement was made as a direct result of Det. Morton making Mr. Marx a promise. A promise to see his son, if only Mr. Marx would confess [sic]. This promise was made sometime during the almost two hours between Det. Morton initially speaking to Mr. Marx and when Det. Morton finally turned his recorder on. A recorder that was only turned on, after Det. Morton asked Mr. Marx if he harmed his wife, and Mr. Marx replied in the affirmative. Once this question was asked, this promise' was made, and the recording device activated, Mr. Marx confessed to Det. Morton.
Mr. Marx’s assertion that Det. Morton made this promise is supported by, not only Det. Morton’s trial' testimony, but also by Special Agent Bosin [sic] of the Naval Criminal Investigative Service. Agent Bosin [sic] testified that while eavesdropping at the door, he heard Det. Morton make a promise to Mr. Marx sometime during that two hours.
WHEREFORE, Defendant prays that this Court reconsider its ruling on Mr. Marx’s motion to suppress, grant his motion to suppress, and grant Mr. Marx a new trial.
*58 Notably, none of the specific grounds enumerated in Article 851 were asserted in the motion filed by trial counsel. At the hearing on December 10, 2013, trial counsel focused only on reconsideration of the trial court’s ruling rendered at the hearing on September 13, 2012. Specifically, when the trial court denied the motion to reconsider its ruling or to reconsider the “motion” to suppress, trial counsel asked: “I assume the motion for new trial is denied likewise?” The trial court replied that it “wasn’t there yet,” but almost immediately thereafter stated that the motion for new trial was “likewise” denied.
Likewise, appellate counsel cites no ground for the motion for new trial, merely making the conclusory statement that the trial court erred in denying the motion for new trial in the last sentence of his argument on Assignments of Error Nos. 1, 2 & 3. La.Code Crim. Proc. art. 852 states, in pertinent part, that “[a] motion for new trial shall be in writing, shall state the grounds upon which it is based,.... ” See also State v. McKinnies, 2013-1412, p. 15 (La.10/15/14), — So.3d -, -, 2014 WL 5393037, p. 9 (under Article 852, “a defendant is required to specify the ground or. grounds upon which the motion is based”). Our review of the record does not indicate that any of the enumerated grounds of Article 851(1)(4) are applicable or that the ends of justice, La.Code Crim. Proc. Art. 851(5), would be served by granting a new trial in this case. Accordingly, the trial court did not abuse its discretion in denying the motion for a new trial. This assignment of error is without merit.

Pro se Assignments of Error

The defendant argues pro se that he was denied his Sixth Amendment right to confrontation and his Fourteenth Amendment right to due process because the evidence was insufficient to convict him. Both claims are based on the following testimony by NOPD Detective Morton relative to DNA — all of which was elicited from the detective during cross examination by the defendant’s trial counsel:
Q. And at the crime scene, other than taking the photographs, you took the doorknobs off of cabinets or the cabinet knobs?
A. Yes.
Q. Because the cabinets had been opened?
A. Yes.
Q. So it’s safe to assume that whoever opened them grabbed the knobs?
A. Touched them, yes.
Q. And you were going to test those for DNA?
A. Eventually.
I24Q. And can we explain to the jury how DNA can get on a knob when somebody touches it?
A. I’m not an expert, but your body secretes oils and moisture. And when you come into contact with something, even though you can’t see it, it leaves tiny traces of it.
Q. And this is what’s called transfer DNA?
A. Yes.
Q. Is that correct?
A. Correct. And it’s on literally any and everything you touch during the course of your day.
The defendant apparently believes that Detective Morton’s testimony as to DNA violated his Sixth Amendment right to confrontation. There is no merit to this argument, particularly as this testimony was elicited from the defendant’s own trial counsel and a defendant cannot complain on appeal that he was prejudiced by evidence he introduced.
Similarly, with regard to the due process aspect of the defendant’s argument— *59 he was denied due process because the evidence was constitutionally insufficient to convict him due to “false” DNA testimony by Detective Morton and the withholding of DNA evidence from defendant—the defendant has made no showing that Detective Morton’s testimony was false. Detective Morton testified minimally that a person deposits one’s DNA on things one touches but no DNA test results were introduced at trial and Detective Morton did not testify that defendant’s DNA was found at the scene, nor did he testify that no DNA from any other person was found at the scene. There was no evidence that any item collected at the crime scene was ever analyzed for DNA evidence[4]. The defendant 1 ^points to no evidence in the record that suggests the State withheld DNA evidence favorable to the defendant. This assignment of error is without merit.

Pro Se Assignment of Error 2

In his second assignment of error, defendant argues that both his trial and appellate counsel' were ineffective. “[C]laims of ineffective assistance of counsel are more properly raised by application for post-conviction relief in the trial court where a full evidentiary hearing may be conducted if warranted.” State v. Howard, 98-0064, p. 15 (La.4/23/99), 751 So.2d 783, 802. Accordingly, we pretermit discussion of this assignment of error.

Pro Se Assignment of Error 3

In what purports to be his third pro se assignment/claim of error, the defendant argues that the State failed to negate the reasonable probability of mis-identification of him as the perpetrator, pointing to the descriptions given by Mr. Barrett and Mr. Sangacruze that included a moustache in conjunction with Ms. Con-ry’s testimony and identifications of photographs taken the day before the murder confirming that the defendant did not have a moustache.
The defendant apparently refers to the jurisprudential burden placed on the State to negate any probability of misidentification of the defendant in order to satisfy its burden under Jackson v. Virginia, supra. See State v. Everett, 2011-0714, p. 15 (La.App. 4 Cir. 6/13/12), 96 So.3d 605, 619 (when the identity of the defendant as the perpetrator is disputed, the State must negate any reasonable Improbability of misidentification in order to satisfy its burden under Jackson v. Virginia). In the instant case, viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that the State negated any reasonable probability of misidentification with the evidence it presented, including defendant’s confession, the evidence recovered from defendant’s white Ford Escape with Texas plates, and the pretrial identifications of the defendant by both Mr. Barrett and Mr. Sangacruze. There is no merit to this pro se assignment of error.

Supplemental Assignment of Error

On November 17, 2014, the defendant filed a motion to supplement his *60 original pro se brief, alleging that his appellate counsel failed to assert a claim that the Virginia Beach police officers who arrested him failed to timely advise him of his rights under Miranda, most specifically his right to counsel. The defendant asserts that he is now entitled to an evidentiary hearing on whether all of his subsequent statements to law enforcement authorities are inadmissible because he was misled into believing that he did not have a right to counsel. The defendant’s reliance on Soffar v. Johnson, 287 F.3d 411 (5th Cir.2000), as authority for this proposition is misplaced. First, the petitioner in that case, a federal habeas proceeding, argued that the police violated his Fifth Amendment rights by continuing to interrogate him in custody, without counsel present, after he invoked his right to counsel. The dispositive issues in that case were: (1) whether the petitioner’s invocation of his right to counsel was sufficiently clear under the totality of the circumstances; and (2) whether a detective’s responses to the petitioner’s inquiries about counsel invalidated the petitioner’s subsequent waivers of his right to have counsel present during custodial interrogation (by at least one li>7other detective) over a period of several days, during which he gave three statements implicating himself in a robbery-triple homicide. Clearly, Soffar does not stand, for the proposition that an arresting officer must give an arrestee Miranda warnings at any particular point proximate to an arrest. Moreover, the original Soffar decision (which the defendant relies upon) was subsequently vacated and, on rehearing, the district court’s denial of the petitioner’s Fifth Amendment claims raised in his habeas petition was affirmed. Soffar v. Cockrell, 300 F.3d 588 (5th Cir.2002).
Finally, the defendant asserts no facts suggesting that he made any inquiry to the Virginia Beach police concerning counsel or that he was misled by the Virginia Beach police into believing that he was not entitled to counsel or had to pay for counsel. Moreover, there is no indication that the issue of counsel was ever discussed by the Virginia Beach police with the defendant. Thus, there is no merit to the defendant’s argument that any statement given by him would be inadmissible under the theories espoused in Soffar, supra.

Conclusion

We affirm the defendant’s conviction and sentence.
AFFIRMED.
LANDRIEU, J., concurs in the result.
LOBRANO, J., concurs in the result.

. On March 12, 2014, the State nolle prose-quied Count 2, the obstruction of justice charge.

. Ms. Conry s first name is spelled "Michelle” in the trial transcript, but she signed her name on the consent to search as "Michele.”

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Immediately after being questioned by defense counsel on cross examination concerning DNA, Detective Morton was asked about fingerprints. He replied to defense counsel that police had dusted for fingerprints but found none suitable for identification. He recalled one "decent” palm print on the doorway where the victim was found between the kitchen and the back bedroom, but replied in the negative when asked whether the police had tried to determine who left that palm print, explaining that he obtained the defendant's confession and evidence supporting the defendant’s identity as the killer. Presumably, this was also the reason that no DNA testing was done on evidence collected at the crime scene.